**GILA RIVER PIMA–MARICOPA INDIAN COMMUNITY et al.**

v.

**The UNITED STATES.**

**Appeals Nos. 9–71, 10–71.**

United States Court of Claims.

Oct. 13, 1972.

Z. Simpson Cox, attorney of record, and Alfred S. Cox, Phoenix, Ariz., for appellants. (Cox & Cox, L. J. Cox, Jr., George S. Livermore, Jr., Stephen L. Cox, Phoenix, Ariz., and Ira I. Schneier, Tucson, Ariz., of counsel).

Roberta Swartzendruber, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for appellee.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS and KUNZIG, Judges.

ON CROSS–APPEALS FROM THE IN-
DIAN CLAIMS COMMISSION

DAVIS, Judge.

The Gila River Pima-Maricopa Indian Community (also known as the Gila River Indian Community) is a recognized Indian group which is the beneficial owner of the Gila River Indian Reservation in Arizona, legal title being in the United States. In the spring of 1942, as part of the World War II project for removing individuals of Japanese ancestry from the West Coast states,[1] the War Relocation Authority (WRA), in charge of the program, determined that a portion of the plaintiff's reservation would make an acceptable site for a "relocation center." Three types of land were considered useful: some 7,000 acres of land already under cultivation (Parcel A); almost 9,000 acres of undeveloped land suitable for cultivation if irrigated (Parcel B); and two smaller nonirrigable tracts for camp-sites (Parcels B–1 and C). The WRA proposed to lease

---

1. See Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); Ex parte Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944).

these areas for a number of years, and to obtain permits to use them.

The negotiations were all between WRA and the Interior Department, without participation by the Indians, and permission was given to begin construction of the center before the Community was notified. As the Indian Claims Commission found, "Finally the plaintiff was presented with the project in the context that WRA 'had taken over' a portion of their reservation, that there was nothing the plaintiff could do about it, and that the superintendent [of the reservation] had obtained for the plaintiff Indians the best terms available." 25 Ind.Cl.Comm. 250, 252 (1971).

In August 1942 WRA and Interior signed a memorandum of understanding incorporating the terms of WRA's use of the selected part of the reservation. Land use permits (which had to be approved by the Community) were to be issued on this basis. These permits were presented to the Indians' council for execution, but (in the Commission's words) "not all of the council members had an opportunity to read the proposed permits before approval, and those who did relied more upon the superintendent's representations concerning the proposed benefits than upon the actual phrasing of the permits." *Id.* at 253. The permits were finally approved by the tribal council in October 1942, by a very close vote.

The relocation center was established and continued in operation for some three years. By June 1943, there were 12,000 evacuees, and the population rose at one point to more than 14,000. There were 67 blocks of construction, including guard barracks, administration buildings, and warehouses, all with appropriate utilities. The evacuees left the center in the second half of 1945, the last leaving in November. The leases were formally terminated in April and October 1947. Disputes then arose over the

compensation to which the Gila River Indian Community was entitled.

When these controversies were not resolved, the Community brought the present actions under Clauses 3 (revision of treaties, contracts and agreements) and 5 ("fair and honorable dealings") of Section 2 of the Indian Claims Commission Act, 25 U.S.C. § 70a (1970), for additional compensation and damages resulting from the WRA's use of the reservation land. The claim with respect to Parcel B became Docket No. 236–A; Docket No. 236–B covered Parcels A, B–1, and C. After trials, the Commission issued interlocutory orders accepting some of plaintiff's demands and rejecting others.[2] Each party has appealed from the aspects of the decisions adverse to it. We shall discuss separately the various claims still controverted.

*I.—Failure to Subjugate Parcel B*

A. Parcel B embraced 8,850 acres "not now fully developed and prepared for irrigation," but capable of being subjugated for agricultural use. The Government did not agree to pay any money for the use of this land, but WRA was authorized (under its memorandum of understanding with Interior) "to develop and use" the tract for five years by "clearing, leveling and bordering the land, manufacturing and installing concrete pipe laterals and irrigation field structures, and all other work incident to the preparation of the lands for irrigation." 25 Ind.Cl.Comm. at 269. This agreement also provided, and the land-use permit approved by the Indians repeated, that no cash rental was being paid since the irrigation work and other improvements would be fair and equitable compensation, but if at the end of the lease the improvements left on the land were not deemed adequate compensation the WRA would pay an additional sum.

By March 1944, WRA had spent only $460 toward subjugating 40 acres of

---

2. The Commission's opinion and findings include both dockets, but separate orders were issued in the two dockets.

Parcel B, but the land was not leveled properly and could not yet be irrigated. In that month, WRA wrote the reservation superintendent that it had abandoned all thought of further subjugation "because we feared great interference from water users under the Coolidge Reservoir. In our opinion public relations would be greatly injured if we attempted to put more land under cultivation at the expense of other water users." 25 Ind.Cl.Comm. at 273. No compensation at all has been paid by the Government for the use of Parcel B.

■ One of the Community's claims is that this failure to subjugate (or to pay adequate compensation) was a breach of the contract between Interior (acting for the Indians) and WRA, and that if the written agreement did not provide for improvement of the whole 8,850 acres it should be revised to that effect both because the Indians so understood it and were led to that belief by defendant's agents, and also because in the circumstances it is fair and honorable to provide full compensation for the Government's omission. The Commission agreed with the last of these contentions, and we uphold the ruling.

The Commission expressly found that "it was the understanding of the plaintiff Indians, from the representations of defendant's agents, that Parcel B would be subjugated[,]" 25 Ind.Cl.Comm. at 275, and referred to "the subjugation work which the plaintiff understood was to be the compensation for the plaintiff's exclusion from Parcel B." *Id.* at 254. The Government challenges this finding, but it is more than sufficiently supported by the whole record. Sustaining it are affidavits of individual Indians (which defendant agreed could be considered as evidence), a clear implication in the minutes of the council meeting addressed on this subject by the reservation superintendent, the express testimony of the Government's own agent who was present at the discussion with the tribe (Mr. Morrison, assistant to the reservation superintendent), the fact that the standard development-type lease on the reservation normally called for subjugation of leased land as part of the compensation, and the wording of the first written communication in the spring of 1942 from the superintendent to the plaintiff which suggested that Parcel B would be prepared for irrigation. It is very clear that the Indians viewed subjugation as their payment for Parcel B, and that the Interior Department's agents consistently fostered that position.

■ With this finding, little weight should be given to defendant's careful scanning of the memorandum of agreement to show that under the refined language of the contract WRA had full discretion to decide how much of Parcel B it would improve.[3] Possibly the vague and overblown language quoted in note 3 could be interpreted in this fashion if the compact were between sophisticated commercial firms, but Indian agreements are to be read as the Indians understood and would naturally understand them. Peoria Tribe of Indians v. United States, 390 U.S. 468, 472–73, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968). Defendant insists that the actual words of the memorandum of understanding and the land-use permits were read and explained to the tribal council, but even so it would be too much to expect the Indians to construe this ambiguous language in the way defendant now does when the Government's own representatives kept pointing in the other direction.

The short of it is that the Commission cannot be faulted for holding that fairness and honor require the Government to make adequate compensation to the Indians for its deliberate failure to subjugate Parcel B.

B. There is also a dispute over the standard of compensation. The Com-

3. The provision on which the Government mainly relies is: "The Authority shall formulate plans with respect to the scheduling of operations and the amount of land in Parcel B which can be effectively and conveniently developed during the period covered by this memorandum." 25 Ind.Cl.Comm. at 269.

mission held the measure of damages to be "the fair market value of Parcel B as it would have been if the defendant had performed the subjugation work, less the fair market value of Parcel B in its raw and, unimproved condition"—as of March 17, 1944, when the Government finally broke its promise.[4] Both sides disagree. The Indians ask us to give them the money which would place them in the same financial position they would have enjoyed had the Government done the full subjugation work on time, including loss of potential profits. The defendant counters that, if anything at all is owing, it should not exceed what a fair rent would be for Parcel B in its then state (desert land used for grazing), *i. e.* 25 cents an acre.

The latter measure is obviously inappropriate for the unexcused failure to subjugate which the Commission found, and we uphold, since it pays no attention to the nature of the obligation which was left unfulfilled.

 Plaintiff's standard, on the other hand, has some initial appeal, but the rule the Commission adopted has been preferred for breaches of a lease-agreement to build on or improve land. See Gardner v. Darling Stores Corp., 242 F.2d 3, 7 (C.A.2, 1957). Where the action is for money damages, not for specific performance, the lessor is entitled only to the damages caused the property by the failure of the lessee to abide by his undertaking. *Cf.* Dodge Street Building Corp. v. United States, 169 Ct.Cl. 496, 499, 341 F.2d 641, 644 (1965); Spitzel v. United States, 146 Ct.Cl. 399, 405 (1959). The subject matter of the lease-agreement was the land, Parcel B, and the lessening in value of that tract, over what it would have been if subjugated, is the proper measure of damage. To grant plaintiff the increased compensation it seeks, including lost potential profits, would be to

award personal and consequential damages, which are not normally allowable for breach of a lease-type arrangement. Fairness and honor do not call for such a special advantage to this particular plaintiff.[5]

## II.—Reasonable rental value for Parcel A

The Interior Department and WRA agreed that, for Parcel A containing 6,977 acres already cultivated, the rental payment should be $20 per acre per year, plus an annual operation and maintenance water charge of $3.60 per acre. The Commission found that plaintiff had failed to show that this was inadequate compensation, and the Community appeals.

 This valuation problem was for the Commission to resolve, and there was substantial support for its determination. The agreed rental amount was based on what was to be asked for the tract from a potential private lessee, a short time earlier, when it had been proposed to lease to outside cultivators in order to aid the war effort; the area had been publicly advertised but no bids were received. Plaintiff's expert considered the fair rental to be $45–50 per acre per year, but the Commission had the right to discount his opinion, as it did, because he made no showing that his survey covered comparable lands. The other bits of evidence on which the Indians rely are clearly not enough to require an overturning of the permissible finding below.

## III.—Removal of camp-site improvements (Parcels B–1 and C)

 For the camp-site locations (Parcels B–1 and C), consisting of non-cultivable property, the plaintiff has conceded that the agreed rental of $1 per acre annually was fair consideration. But the claim is made that the agree-

---

4. 25 Ind.Cl.Comm. at 276. A further hearing was ordered on that issue.

5. It should not be forgotten that the Government could have taken a leasehold interest in Parcel B by eminent domain, and in that situation the award would not exceed the ordinary rental value of the tract for its best available use.

ment should have required the Government to leave the improvements at the end of its use (this was not done, the defendant destroying the improvements and leaving a mass of concrete and rubble). In any event, the Community argues that it should be compensated for the failure to restore the land to its original condition. The Commission held that there was no duty to leave the improvements, but that defendant was liable for the decrease in fair market value attributable to the failure to restore. We agree.

A. It is indisputable that the written documents contained no promise, express or implied, to leave the buildings and other facilities on the camp-sites,[6] and the Commission has found, with adequate support, that the plaintiff was never informed, and never understood, that these improvements would be left for the tribe.

■ There was no legal obligation to include such a provision—ordinarily, the Government retains the right to remove its improvements—nor in the circumstances was it demanded by the standard of "fair and honorable" dealings.[7] Plaintiff says that the general criteria for all WRA centers prescribed their location on public land "so that improvements at public expense become public, not private, assets." But this over-all requirement did not imply that the improvements here would necessarily be given to the tribe; all that it called for is that they not fall into private hands.

■ B. Defendant does not challenge the Commission's ruling that it was liable for failure to restore, but there exists a controversy over the measure of damages. The Community seeks enlargement of the award to cover the cost of restoring the land, not merely (as the Commission held) the diminution in the fair market value of the sites

due to the failure to put the area back into its condition.

The ruling below accords with our decisions in Dodge Street Building Corp. v. United States, *supra*, 169 Ct.Cl. 496, 341 F.2d 641 (1965), and Spitzel v. United States, *supra*, 146 Ct.Cl. 399 (1959), that "[w]here the expense of restoration exceeds the diminution in the market value of the property caused by the lessee's nonperformance, the diminution in fair market value is the proper measure of damages." 169 Ct.Cl. at 499, 341 F.2d at 644. The Indians maintain, however, that they should be treated differently because they cannot sell their land and purchase another tract in the same way an ordinary owner can. This is true, but the focus of recovery in a damage action still remains a comparison in monetary terms between what the injured party would have obtained (with respect to the land) if the contract had been fully performed, and what he actually got. If the Government had fulfilled its obligation, the Community would have had land worth something more, which it could lease at that value (even if it could not sell); now, because of the Government's failure to clear, the parcel is worth much less. The Community should have that difference, but not more. It is appropriate, once again, to invoke the eminent domain comparison. If the tract had been taken for the war period and not restored, compensation would have been on the basis of the decrease in fair market value.

*IV.—Permanent improvements left on the site*

■ The Commission allowed no credit to defendant for the roads, fences, and cattle guards which the Government constructed on the reservation and left there. The theory behind this holding was that those improvements were all for WRA's use in carrying out its proj-

6. On the contrary, the memorandum of agreement with Interior specifically authorized WRA "to remove all camp-site improvements and fixtures upon the termination of the permit."

7. If use of the camp-sites had been condemned for a temporary period, there would obviously be no obligation to let the improvements stand at the end of the term.

ect, not for the Indians' benefit, and that they were not inducements to the Indians to make the contract. The defendant appeals.

With respect to the road connecting with Arizona State Highway No. 187, we think the Commission plainly erred in characterizing it as not at all for the Community's benefit.[8] The record indicates that, when it appeared early in 1944 that WRA might not complete the last 7 miles of this road, the reservation superintendent wrote to WRA that "in my estimation, it is the most valuable road on the reservation from an Indian standpoint. * * * this road is a tangible asset and a valuable one to the reservation and to the State." The tribal council also resolved that "[t]his road is essential, not only to the War Relocation Authority but to the Indians as a farm-to-market highway * * *." Moreover, the last evacuees left the center in November 1945, but the remaining 7.25 miles of the road were not completed until December 1947, two years after WRA had stopped use of the land for its own project. Thus, the record as a whole shows conclusively, in our view, that the Indians were a major beneficiary of this road.

However, this does not automatically answer the problem whether the defendant is entitled to an offset or credit for its expenditures on the road. On that precise issue, the record is not now clear enough for us to decide, and we must remand to the Commission for further consideration. Our difficulties are threefold.

First, we cannot on the existing record say as a matter of law that the road was part of the consideration for the lease of Parcel B, or for the project

as a whole. On the one hand, there is the resolution of the tribal council, deploring the delay in completion (referred to above), which says that the Indians "consider this improvement as a part of the payment for the use and occupancy of our lands and that such abandonment of this project, as is contemplated, would constitute a breach of contract resulting in loss and disadvantage to us[.]" And in his preliminary report Commissioner Yarborough (who presided at the trial) stated that the value of the permanent improvements "was a part of the compensation for the transaction as a whole (Parcel B, Parcel A, and campsites)." But the whole Commission, in its opinion, seems to deal with this claim by defendant as if it related only to Parcel B (Docket No. 236–A), and found that "[w]ith respect to Parcel B, such improvements cannot be viewed as part of the consideration for the five-year lease, since they were intended to serve the defendant-lessee's camp sites and irrigated lands." This determination was tainted, as we have held, by the Commission's erroneous view that the Indians were not intended as substantial beneficiaries of the road. We are not certain how the Commission would hold if it accepted, as we have ruled it should, the opposite view that the Indians were at least equal beneficiaries. The role of the road as part of the consideration (or not) is conceptually separate from the factual issue of whether the Community was to benefit. The road might have been intended as a gratuity rather than as part of the consideration for the lease-agreement.[9] In addition, if the road was in fact consideration, was it so only for Parcel B or for the entire project? The opinion, findings, and record now

---

8. As for the other improvements remaining on the reservation, defendant presents an insufficient showing that the Commission was wrong.

9. The opinion below says that "[i]n his discussions which would lead to securing approval by the tribal council, the [reservation] superintendent assured the In-

dians * * * that certain permanent improvements in the form of roads, fencing, cattle guards, and the like would be left on the Indian's land." 25 Ind.Cl. Comm. at 252. We are not clear whether he presented this as part of the consideration for the arrangement, or as a gratuitous by-product of the WRA project.

under review leave these matters unclear.

Second, even if the road was part of the consideration, we are not certain that it should necessarily be credited against the award. The Claims Commission Act, 25 U.S.C. § 70a (1970), directs "appropriate deductions for all payments made by the United States on the claim," but a deduction would only be "appropriate" if the award would otherwise be for the total amount due the claimant, computed without any deduction or credit. If the award is not total but covers only separate or additional consideration, there should obviously be no credit or deduction. That is what plaintiff urges here. It says that the Commission's award (which we affirm) covers only part of the consideration, consideration which is independent of and additional to the value of the road, and does not encompass it.

Third, the gratuitous offset provision of the Act, 25 U.S.C. § 70a, establishes certain standard which have not yet been applied to this case by the Commission; we note, for instance, that the statute excepts from allowable offsets monies spent for "highway purposes." If the road was a gratuity, these offset provisions govern and the Commission must determine, among other things, whether the expense was for "highway purposes." The offset provisions could conceivably even play a part in deciding the preliminary question of whether the road was a gratuity or part of the consideration for the lease of Parcel B, or for the whole project.

These are complexities the Commission should go into on remand. We cannot do so ourselves, at this stage. Insofar as the issues are factual, they are for the fact-finders in the first instance; and to the extent there are legal components, the present record and arguments are too skimpy for us to render an informed decision.

The Commission's interlocutory orders (dated April 28, 1971) are affirmed on both appeals, except that (as indicated in Part IV, *supra*) with respect to defendant's demand for a credit, deduction, or offset for expenditures on the road connecting with Arizona State Highway No. 187 the Commission's finding that the Indians were not intended as substantial beneficiaries of the road is reversed, and the case is remanded (in both dockets) to the Commission to consider further that demand of the defendant.

Affirmed in part, reversed in part, and remanded.