Antonio Limtiaco SAN NICOLAS

v.

The UNITED STATES.

No. 284–74.

United States Court of Claims.

March 19, 1980.

As Amended May 30, 1980.

---

Roland H. Acosta, Agana, Guam, attorney of record, for plaintiff; Arriola, Cowan & Acosta, Agana, Guam, of counsel.

C. David Redmon, Washington, D. C., with whom was Asst. Atty. Gen., James W. Moorman, Washington, D. C., for defendant.

Before KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Kenneth R. Harkins, filed February 23, 1979, pursuant to Rule

134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, with one minor exception,* it hereby affirms and adopts the recommended decision as the basis for its judgment in this case.

## OPINION OF THE TRIAL JUDGE

HARKINS, *Trial Judge:* Antonio Limtiaco San Nicolas, plaintiff, is the owner of beach front property on the island of Guam which, from April 1, 1963, through June 30, 1972, had been leased by the United States Navy. Plaintiff seeks damages for unauthorized use under the lease, for waste of the land, and for breach of an express covenant to restore the premises to the condition that existed when the lease was entered. For the reasons set forth below, defendant has breached the covenant to restore and plaintiff is entitled to recover as damages the cost involved in excavation and removal of rubbish and construction debris dumped and left on the leased land.

Plaintiff's land (Estate No. 103 Remainder) is located in Finegayan, municipality of Dededo; it is totally surrounded by land owned by defendant. Estate No. 103 Remainder is a narrow strip, triangular in shape, nearly 2,000 feet in length and from 800 feet to 50 feet in width. A steep cliff, approximately 300 feet high, rises from the shoreline at the southern end of plaintiff's property and is approximately 500 feet inland at the northern boundary. The parties stipulated that the parcel contains 69,255.01 square meters, approximately 17.11 acres.

In 1951, the beach front portion of Estate No. 103 contained 182,405.55 square meters (approximately 45.07 acres). In that year, the United States leased 5,584.69 square meters (approximately 1.38 acres) for use by personnel of the Naval Communications Station as a recreational beach area (NCS Beach). Complaints that NCS personnel were using more area than had been leased led to negotiations that culminated on April 1, 1963, in a lease for the entire beach front portion of Estate No. 103 (Lease No. NOy(R)–51444). Annual rental for the entire 45.07 acres was $700; the lease was renewable from year-to-year on 30 days' notice for a period to end June 30, 1972. Plaintiff negotiated the lease as agent for his father who then held title; when the lease was entered, the parties intended that the property be used for a recreation beach. The lease was on Navy forms and included the then standard clauses relative to a condition report (clause 9(f)) and to restoration of premises (clause 9(c)). The condition report, dated March 28, 1963, showed that coconut trees, breadfruit trees and papayas grew on the premises in a wild state, that the cliffside was covered with jungle growth, that there were no cultivated areas, and that subsequent to Typhoon Karen (March 1962) the area was covered with debris from 1 to 2 feet in depth that consisted of broken coconut fronds and fallen trees.

On September 13, 1967, plaintiff acquired Estate No. 103 from his father through a deed of gift. In September 1968, the United States purchased 113,150.54 square meters (approximately 27.96 acres) of the leased land in fee for $25,071.

After the 1968 sale to the United States, rental under the 1963 lease for the remaining portion of the leased property was reduced a pro rata amount. The lease was renewed periodically, and, according to its terms, it was terminated on June 30, 1972. When the 1968 sale was made, plaintiff knew that the United States proposed to

---

* The court adopts with one exception the trial judge's separate findings of fact, which are set forth with his opinion but are not printed herein since such facts as are necessary to the decision are contained in the opinion. The one change is the substitution of the figure $184,000 for $110,000 in finding 12 to correct an obvious, inadvertent error. The change in no way affects the conclusion of law.

construct the Tanguisson Power Plant on the land and that the land sold would be used for both the power plant and for the NCS Beach, which would continue in use.

In September 1970, the United States sold to the Guam Power Authority 4,228.35 square meters (approximately 1.044 acres) of the land it had purchased. The Guam Power Authority paid $21,141 for this area, which was restricted in use to construction of an enlarged facility, Tanguisson Power Plant Increment No. 2.

The Tanguisson Power Plant was constructed on the southern portion of the land purchased by the United States, immediately adjacent to Estate No. 103 Remainder which continued under the lease. During construction of the power plant, the United States used the leased property as a staging area. In so doing, trees and foliage were cleared by bulldozer, and heavy materials and equipment were stored on the leased land. In addition, construction spoil and debris were dumped on the leased premises. Construction spoil dumped on the leased land included rubbish, parts of broken or unused I-beams, steel bands and ribbons, steel reinforcing rods, concrete aggregate, and coral debris that had been excavated to construct power plant cooling channels.

On May 23, 1972, prior to the termination of the lease, plaintiff gave timely notice that the lease required defendant to restore the premises to its original condition. Plaintiff's notice specifically requested that the construction debris be removed from the property.

Although defendant had an estimate made of the cost required to restore the land to its original condition, for some reason defendant did not remove the dumped rubbish and construction waste. Defendant estimated that for a total cost of $17,149, the land could be restored to its original condition. In lieu of removing the rubbish

from the property, defendant packed down (but did not consolidate) the foreign material, covered the area with a thin layer of sand and crushed coral, and graded the fill area to create a slope toward the water.

The area used for a staging area and for a dump was approximately 3.5 acres, and the dumped materials (sometimes called "fill") varied in depth from 1 foot to 6 feet. The 3.5 acre fill area constitutes approximately 20.5 percent of the 17.11 acres in Estate No. 103 Remainder, and is more than half of the level beach area between the shoreline and the cliff.

Plaintiff claims $50,000 in damages for unauthorized use of the leased property during construction of the Tanguisson Power Plant on the ground that defendant was committed to use the leased premises only as a recreational beach. In support, plaintiff traces the requirement for a condition report in clause 9(f) of the general provisions of the 1963 lease to a statement in the condition report that the premises were "proposed to be leased * * * for a recreational beach."

Although a condition report is one of the lease documents,[1] it only is descriptive of the property and is not incorporated in the lease as a restriction on the use of the leased premises. In the condition report, the parties jointly attest to the condition of the property at the beginning of the lease; the condition report does not limit lessee's rights, conferred by other provisions, to occupy the premises "for government use," and "to make alterations, attach fixtures and erect additions, structures, or signs." No specific use is prohibited and the lease, and clause 9(m), recited that no additional provisions were incorporated by attachment or reference. A tenant is entitled to use leased premises for any lawful purpose as long as such use is not expressly, or by necessary implication, forbidden by the leasing instrument. Defendant's use of the

---

1. *Eaddy v. United States*, 134 Ct.Cl. 338, 343, 139 F.Supp. 49, 52 (1956).

leased premises as a staging area during construction, and as a temporary storage area for construction waste, does not amount to an unauthorized use of the leased premises.

When the lease was negotiated in 1963, both parties intended the premises would be used for a recreational beach. A portion of the premises leased in 1963 was so used throughout the lease period, and, after the 1968 purchase of the northern part, the NCS Beach continued as an active recreation facility. Plaintiff made the 1968 sale with knowledge that defendant intended to construct a power plant on part of the purchased land. In the construction of the power plant in the early 1970's, defendant probably used the adjacent leased premises to the south for a staging area rather than the property it owned in the north to avoid interference with the NCS Beach.

■ Although use of the leased premises as a staging area or for storage of construction waste would not be a prohibited use under the lease, defendant's failure to restore the premises violated its commitment in clause 9(c). The lease did not authorize defendant to use the leased premises as a permanent dump; nor did it authorize defendant to leave the premises at the end of the lease in a condition that impaired their value and usefulness as recreational beach front property.

Before its expiration, clause 9(c) obligated defendant to "restore the premises to the same conditions as that existing at the time of entering this lease, reasonable wear and tear by the elements excepted." Defendant's failure to remove the rubbish and

construction waste and restore the premises, or, at least to have compacted the fill area and left the premises with access to the beach front property in a condition suitable for normal usage as a recreational beach, is a failure to return the property to the lessor in the condition prescribed. It constitutes a breach of defendant's obligations.

■ Where there has been a breach of an obligation to restore leased premises to the original condition, plaintiff is entitled to recover the damages he actually suffers. Damages measured by the cost of restoration generally are adequate to place a plaintiff in the position he would have been in had the lease contract not been breached. In order to avoid windfall recoveries, however, the measure of plaintiff's damage is not the cost of restoration where such cost exceeds the diminution in market value of the premises. A plaintiff is not permitted to recover damages that exceed the diminution in fair market value that was caused by defendant's nonperformance.[2] Plaintiff has the burden to establish by a preponderance of the evidence that the fair market value of the property in the condition which the defendant had covenanted to restore it was greater than the property's fair market value in an unrestored state at the termination of the lease.[3] Recovery also is limited to the diminution in fair market value in cases where the defendant has breached the implied covenant not to waste the lessor's estate.[4]

In this case, the diminution in fair market value rule has limited application. Plaintiff's property was unimproved land on which rubbish and construction waste

---

**2.** *Missouri Baptist Hosp. v. United States*, 213 Ct.Cl. 505, 511–15, 555 F.2d 290, 294–95 (1977); *Gila River Pima-Maricopa Indian Community v. United States*, 199 Ct.Cl. 586, 596, 467 F.2d 1351, 1357 (1972); *Dodge St. Bldg. Corp. v. United States*, 169 Ct.Cl. 496, 341 F.2d 641 (1965); *Realty Assocs., Inc. v. United States*, 134 Ct.Cl. 167, 170, 138 F.Supp. 875, 878 (1956).

**3.** *Dodge St. Bldg. Corp. v. United States, supra* note 2, 169 Ct.Cl. at 501, 341 F.2d at 645.

**4.** *United States v. Bostwick*, 94 U.S. 53, 66, 24 L.Ed. 65 (1876); *Eaddy v. United States, supra* note 1, 134 Ct.Cl. at 341, 139 F.Supp. at 51.

were dumped. We are not confronted with the problems of replacing damaged structures or removing improvements.

The effect of defendant's failure to remove the dumped materials renders plaintiff's property unsuitable for its highest and best usage, as a recreational beach. Plaintiff has little opportunity for a windfall. Unless the "fill" is removed, plaintiff cannot realize the highest and best usage or be in as good a position as he would have been in if defendant had not breached. Until the dumped debris is removed, adequate access to the property cannot be constructed nor can simple single family dwellings be erected. Use of piling on the "filled" area is prohibitively expensive in Guam for dwellings, and is not feasible for an access road.

Each party provided testimony and documentary evidence from real estate appraisal witnesses. Both experts were in agreement that, although presently no existing utilities were on the premises, electricity and water would be available; both agreed United States ownership of surrounding lands did not restrict access to the property; both agreed that the highest and best use of plaintiff's property was as a recreational beach, which would include single family residences and beach cottages. Plaintiff's appraisal expert added the qualification that the highest and best use would be as a recreational beach "if the parcel is properly cleared of all obstructions, undergrowth, and is graded."

In addition, the appraisal experts concurred that seashore parcels are in short supply and seldom are sold in Guam because of a customary reticence by native Guamanians to sell beach front property. Real estate prices on Guam, between 1968 and 1972, dramatically increased.

The appraisal reports of both experts were based upon the market data approach to value, i. e., the value estimate is predicated upon prices paid for similar properties equally desirable. The major difference between the appraisals by the respective experts was the amount of land considered to be available for use as a recreational beach.

Plaintiff's appraisal expert viewed the entire Estate No. 103 Remainder as a unit, and computed a single valuation on the basis of an amount per square meter for the 69,255.01 square meter area. Defendant's appraisal expert, on the other hand, divided the property into a usable level beach portion (estimated to contain approximately 14,942 square meters) and an unusable remainder that consisted of cliffline, steep hillside, and unusable beach front portion (estimated to contain 54,313.01 square meters). Defendant's expert found that only approximately 3.69 acres of the total 17.11 acres were usable, and 78.42 percent or 13.42 acres were unusable. For the usable portion, defendant's appraisal expert applied a value per square meter that was based upon comparable sales; the unusable portion was assigned a value of 1 percent of the usable area's estimated value. In addition, the fill area (estimated in the report at 8,100 square meters, or approximately 2 acres) was considered to be an improvement that would support recreation or beach-type construction.

On the basis of nine comparable sales, plaintiff's appraisal expert valued the premises as of June 30, 1972, at $5 per square meter. The 69,255.01 square meters would have a total valuation of $346,275.05 if the parcel was cured by clearance of all undesirable fill.

Defendant's appraisal expert found ocean front property had a value of approximately $8 per square meter; and, if the property had sufficient land area or soil composition to support recreational type or beach dwellings, the value would increase to approximately $10 per square meter. At $8 per square meter, the 14,942 square meters defendant's expert considered to be usable produced a total value of $125,000 for the property in an undisturbed condition without the fill. Since addition of the fill was considered to be an improvement, in de-

fendant's analysis of the unrestored "after" condition, the fill area was valued at $10 per square meter. With a total of $81,000 for the approximately 8,100 square meters of fill area, a total of $54,736 for the remaining 6,842 square meters of usable area valued at $8 per square meter, and $4,345 for the unusable cliff areas, defendant's expert found a total value after the addition of the fill at $140,000.

Defendant's expert made his appraisal of the fair market value of the property after addition of the fill on the basis that the fill covered 2 acres. Subsequently, the parties stipulated the surface area containing fill placed by defendant amounted to approximately 3.5 acres. Adjustment of defendant's appraisal report to reflect a 3.5 acre fill area valued at $10 per square meter produces a total "after" valuation of $152,-210.[5]

Reliability of the market data approach to valuation is dependent upon the selection of transactions with comparable data, on the accuracy of adjustments for differences in time, size, and other variables, and upon verification of the sales data. Plaintiff's appraisal expert utilized nine comparable sales to determine a June 30, 1972, valuation and five comparable sales to determine a February 22, 1978, valuation. Defendant's appraisal expert utilized 15 comparable sales from June 1968 through August 1972. The unit value of $5 per square meter derived by plaintiff's expert is more conservative than the $8 per square meter derived by defendant's expert. Although the two unit values are within a reasonable range of each other, the value produced by plaintiff's expert resulted from application of better appraisal techniques.

Plaintiff's appraisal expert, for example, followed accepted appraisal practice and applied a weighting process in his consideration of the various characteristics of property. Beaches on the northern half of the island, where plaintiff's property is located, are sandier and generally more desirable than beaches in the southern part of the island. Comparative sales selected by plaintiff's appraisal expert were located in the northern half of the island. Defendant's appraisal expert, on the other hand, selected most of his comparable sales from the southern half of the island.

Both appraisal experts were handicapped by a scarcity of sales of beach front property that were truly comparable to plaintiff's land. Plaintiff's appraiser could find no beach front property sales that had a reasonable proximity to plaintiff's land. Sales of beach front property on the southern half of the island cited by defendant's appraiser were not satisfactory comparables.

On the basis of both appraisal reports, and on consideration of the foregoing, the unit value of $5 per square meter recommended by plaintiff's appraisal expert is the more reasonable and is accepted as the appropriate unit amount for valuation of Estate No. 103 Remainder as of June 30, 1972.

Defendant's appraisal expert divided the Estate No. 103 Remainder into usable and unusable portions. No adequate explanation was given for such division, and it is not customary practice in appraisals of beach front property. With the exception of the 1968 sale of part of Estate No. 103 to the United States, used by defendant's appraisal expert, neither appraiser cited any transfers of beach front property sold on the basis of usable and unusable segments. None of defendant's other comparable sales were divided into usable and unusable segments. Both appraisal experts agreed that the highest and best use for Estate No. 103 Remainder was as a recreational beach. Elimination of more than half of the total area of the property for any recreational use, in the absence of specific restrictions on the type of recreational uses permitted, is arbitrary. In addition to esthetic and

---

**5.** This amount includes: $141,641 for 14,164.1 square meters at $10; $6,224 for 778 square meters at $8; and $4,345 for 54,313.01 square meters at $0.08.

scenic values, the cliff feature on Estate No. 103 Remainder has utility for recreational uses other than swimming and sun bathing, such as bird watching, hiking, rope climbing, and photography.

Defendant's division of the premises into usable and unusable portions is artificial and arbitrary. The entire area of Estate No. 103 Remainder should be considered as a unit in a valuation for recreational uses.

Defendant's appraisal expert also assumed that the fill area was adequate support for construction and his valuation of the property was based on this premise. The record does not support his conclusion; defendant did not provide, by testimony or other evidence, any support from an architect, engineer or soil expert for its appraiser's conclusion. Evidence in the record shows beyond challenge that the fill area does not enhance the value of plaintiff's property as a recreational beach.

Buried rubbish such as in the fill will not provide an adequate foundation for even modest structures and must be removed before construction can be undertaken. Construction debris and rubbish in the fill are not compacted; empty pockets and voids make the surface unstable. At least portions of the existing fill must be removed to provide support for foundations or for concrete slabs. Use of pilings to penetrate the unsatisfactory fill to support residential construction would be prohibitively expensive in Guam. Access to the property requires construction of a road that traverses the fill area. An access road will not be stable unless rubbish is removed.

Defendant contends that plaintiff has failed to establish the diminution in fair market value caused by its failure to remove the fill. This contention has no merit. Plaintiff's appraisal expert provided a value for the property as of June 30, 1972, the date the lease terminated, in both a restored state and an unrestored state. Plaintiff has carried its burden of proof on the diminution issue.

Sale of Estate No. 103 Remainder for use as a recreational beach requires, in a valuation of the property, an allowance for the cost to remove the unsatisfactory fill. Any purchaser would require a deduction in price to permit recoupment of the costs required to cure the defect in the property. Plaintiff's appraisal expert equated the cost of restoration with the diminution of value of the premises in an unrestored condition.

On the assumption that the fill area occupied approximately 6 acres, plaintiff's appraiser estimated it would cost $246,000 to cure the fill area and restore the premises to their original condition. As of June 30, 1972, accordingly, his valuation of the premises was $346,275.05 in a restored condition and $100,275.05 in an unrestored condition. After the trial, the parties stipulated the fill area occupied 3.5 acres, and the estimates of the cost to restore were revised to $235,390 by one contractor and to $184,000 by another. When adjustments to the $346,275.05 value as restored are made, the value of the premises in an unrestored state, on the methodology used by plaintiff's appraiser, would be $110,885.05 on the Black Construction Company estimate and $162,275.05 on the Perez Brothers, Inc., estimate.

To establish damages and to show an unauthorized use, plaintiff elicited testimony that latte stones on the premises were either knocked down, removed or destroyed during defendant's occupancy. Latte stones are artifacts constructed by the aboriginal peoples on Guam. The stones vary in size from 6 to 8 feet in height, and are columnar in shape, with a bulbous cap which is larger in circumference than the remainder of the column. The precise use of latte stones is unknown; they may have been used as supports for buildings, or other structures, or they may have religious significance. In any event, the latte stone now has symbolic usage on Guam as an identification with its native heritage. Evidence in the record is not clear as to the number of latte stones supposedly present

when the premises were first leased; the condition report did not mention their presence. Nor is it clear whether any stones, if present, were located on Estate No. 103 Remainder or on that land sold to the United States in 1968. In these circumstances, no allowance is made for destruction or removal of any latte stones, or of any diminution in value attributable as a result.

Plaintiff's estimates from construction companies of the cost to restore Estate No. 103 Remainder were on a lump-sum basis, which included both the costs to excavate and remove the fill from an area of 3.5 acres, and the costs to plant and maintain various quantities of trees, shrubs and ferns. Inclusion of costs of new trees, shrubs and ferns in damages for a failure to restore is questionable in this case. The condition report shows that vegetation on the leased premises had been severely damaged in 1962 by Typhoon Karen. Further, foliage that existed at the start of the lease grew in a wild state and was not the product of cultivation. There is no evidence that coconut trees previously on the premises were income producing, and there is no evidence that natural reseeding cannot provide the type of shade and cover that previously existed. The record contains no evidence as to the extent that defendant's removal of any foliage diminished the value of the premises. For these reasons, costs for restoration of foliage are not allowed as elements of damage in this case.

In their final estimates, plaintiff's contractors did not provide breakdowns which would allow an allocation in the lump-sum estimates for costs required to excavate and remove the unacceptable fill material. Testimony of the contractors at trial, however, provides a basis for ascertaining the costs required to excavate the fill area and to haul the debris to a dump. Both contractors estimated their costs on the assumption that the debris would have to be hauled to the Ordot Dump, a distance of approximately 12 miles. Black Construction Company's first estimate provided for the excavation of 33,500 cubic yards of debris for $46,725; this is an excavation cost of $1.395 per cubic yard. To haul the 33,500 cubic yards to the Ordot Dump, Black estimated a cost of $139,555, which is approximately $4.166 per cubic yard. These values, when applied to 25,410 cubic yards of debris, would amount to $35,446.95 for excavation, and to $105,858.06 for hauling, a total of $141,305.01.

Testimony for Perez Brothers, Inc., shows that 36,000 cubic yards of debris would be excavated for $30,000, or $0.833 per cubic yard. To haul this amount of debris to the Ordot Dump was estimated at $180,000, or $5 per cubic yard. In its revised estimate, Perez Brothers, Inc., would remove 25,400 cubic yards from the 3.5 acre fill area. When its unit values are applied to this volume, $21,158.20 would be for excavation, and $127,000 for the cost of hauling, a total of $148,158.20.

Costs required to excavate and remove the unauthorized debris in the fill area properly are elements of plaintiff's damages. These costs amount to $21,158 on the Perez Brothers' estimate and $35,447 on Black Construction Company's estimate. Although the construction companies when they made their estimates were justified in assuming that civilian contractors would have to use the Ordot Dump, it may not be necessary to incur the costs to haul the fill material 12 miles. Plaintiff's property is entirely surrounded by land owned by the United States some of which was formerly used, but is not now being used, for Harmon Air Force Base housing; a 12-mile haul to the Ordot Dump may not be necessary in fact. Defendant, perhaps, may find it preferable to permit disposal of this rubbish on other property owned by defendant if such disposal would be without deleterious effects. In such a contingency, plaintiff should recover only costs for hauling the removed debris to a point designated by the Government. Damages awarded to plaintiff for defendant's failure to restore the premises therefore amount to $35,447 for the cost of excavation of the fill area, plus an amount that represents the cost which may be required to be incurred to haul the excavated materials to a point to be designated by defendant.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, the court concludes as a matter of law that plaintiff is entitled to recover the sum of thirty-five thousand four hundred forty-seven dollars ($35,447). However, judgment therefor will not be entered until the proceedings are complete under Rule 131(c) for a determination of the remaining amounts due plaintiff, if any, for the costs required to haul away excavated materials. The case is returned to the trial judge for proceedings under that rule with the instruction that he is to proceed expeditiously to enter his decision in accordance with the foregoing opinion, as amended.