## The AMERICAN INDIANS RESIDING ON the MARICOPA–AK CHIN RESERVATION

v.

## The UNITED STATES.

### No. 235.

United States Court of Claims.

Dec. 2, 1981.

Alan J. Cox, Phoenix, Ariz., attorney of record, for plaintiff, Z. Simpson Cox, Phoenix, Ariz., Ira I. Schneier, Tucson, Ariz., Sandra L. Massetto, Cox & Cox, Phoenix, Ariz., of counsel.

Richard L. Beal, Washington, D. C., with whom was Asst. Atty. Gen., Carol E. Dinkins, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and BENNETT and SMITH, Judges.

## OPINION

PER CURIAM:

This case comes before the court on the exceptions of the parties to the recommended decision of Trial Judge Kenneth R. Harkins, filed September 16, 1980, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's comprehensive

opinion, as hereinafter set forth,* we hereby affirm and adopt the decision as the basis for our judgment in this case, with the deletion of his discussion as to plaintiff's remedies on potential claims that arose after August 13, 1946. As to this matter, we add the following paragraph.

■ As set forth in the trial judge's decision, the record is to be closed on any further claims of plaintiff that arose before August 13, 1946. This conclusion is required in view of the difficulty and expense of further accountings and the doubtful existence of any additional substantive claims. But plaintiff is not precluded from pursuing claims that arose after August 13, 1946. Such claims are cognizable in this court. 28 U.S.C. § 1505 (1976). However, these claims must be developed independently and not as the result of an accounting ordered by this court. Unlike the Indian Claims Commission, this court has no equity jurisdiction to entertain a suit for an accounting except in aid of a judgment of liability against the Government. *Klamath & Modoc Tribes v. United States*, 174 Ct.Cl. 483 (1966). Finally, it should be noted that any such claims are subject to the appropriate statute of limitations and must be filed within 6 years after the claim first accrues. 28 U.S.C. § 2501 (1976).

## OPINION OF THE TRIAL JUDGE

HARKINS, Trial Judge: This case involves the last remaining cause of action—for a general accounting—in the petition filed August 8, 1951, by plaintiff, the American Indians residing on the Maricopa-Ak Chin reservation. The case was transferred to the court on July 13, 1978,[1] after trial by the Indian Claims Commission (the Commission) on May 16, 1977, on the general accounting cause of action. Proof was closed in this court on February 27, 1979, and posttrial briefing was completed February 11, 1980. Plaintiff is entitled to recover. Defendant has failed to account, in accordance with the fiduciary standards applicable to Indian funds and property, for funds received and held for plaintiff's benefit and for property it managed.

---

Plaintiff's 1951 petition stated six causes of action against the United States, as plaintiff's guardian: (1) failure to develop the water and agricultural resources of the reservation; (2) failure to prevent encroachments on reservation lands by the State of Arizona, other non-Indian organizations, and individuals; (3) failure to protect plaintiff from predatory attack by warlike tribes of Indians and by whites; (4) failure to provide an adequate educational system, equal to standards required by the State of Arizona; (5) failure to provide sufficient medical, dental, and sanitation facilities; and (6) for a full and complete accounting of income and disbursements and for funds, assets, and properties administered by defendant. The second and third causes of action were dismissed on March 7, 1968, on plaintiff's motion without trial;[2] the fourth and fifth causes of action were dismissed on October 15, 1969, on defendant's unopposed motion;[3] the first cause of action was dismissed with prejudice on September 19, 1973, after trial.[4]

Plaintiff's demand for a general accounting was not expeditiously handled at the Commission. The General Services Administration's (GSA) accounting report, filed

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed September 16, 1980, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. Pursuant to Indian Claims Commission Act § 23, 25 U.S.C. § 70v (1976).

2. 19 Ind.Cl.Comm. 80 (1968).

3. 21 Ind.Cl.Comm. 423 (1969).

4. 31 Ind.Cl.Comm. 384 (1973). Plaintiff's claim that the United States has failed to meet its responsibilities for the provision of water essential for reservation purposes has been resolved legislatively. Pub.L.No. 95–328, 92 Stat. 409 (1978), provides a 25-year program for study and development of economically recoverable ground water for irrigation purposes; in exchange, the Ak Chin community waives any and all past and future claims of water rights or injuries to water rights.

April 16, 1971, applied to four Indian Claims Commission dockets.[5] The GSA report, which contained 96 pages, purported to be a general accounting for all of the Pima-Maricopa Indian tribes of Arizona for the period from March 3, 1883, to June 30, 1951. The portion concerned with plaintiff's money and properties was contained on a scant eight pages.

Plaintiff filed ten exceptions to the GSA report on August 7, 1972; defendant's response was filed November 4, 1972. Plaintiff's principal exceptions to the GSA report were general and conclusory in form and emphasized defendant's failure to provide sufficient factual information to be meaningful.[6] Other exceptions alleged particular transactions for which there was no accounting, such as leases of reservation lands, grants of rights-of-way, protection of water rights and disbursements of Indian funds.

In further proceedings before the Commission, plaintiff's exceptions were recast to make more definite. On January 14, 1976, five exceptions were dismissed.[7] In its January 14, 1976, opinion, the Commission ruled that exception No. 1 as restated alleged inadequate accounting for seven agricultural leases and two rights-of-way. The Commission further concluded that information relative to the rights-of-way related to restated exception No. 2. The Commission found the following would be tried: restated exception No. 1; restated exception No. 2; exception No. 7 (disbursements of tribal funds); exception No. 9 (proper credits for interest); and exception No. 10 (reverse spending).[8]

Plaintiff's restatement of exception No. 1 asserted defendant in a wrongful continuing program leased plaintiff's reservation property seven times for agricultural purposes. In its January 14, 1976, order, the Commission concluded that six of the agricultural leases had not been shown to have been made prior to August 13, 1946. As a result, the Commission denied plaintiff's motion for a supplemental accounting and granted defendant's motion for partial summary judgment with respect to the six post-1946 agricultural leases. The T. G. Decker lease, dated February 1, 1946, clearly arose before the August 13, 1946, cutoff. Defendant was directed to supply a copy of the T. G. Decker lease, and to make a full accounting of all funds collected between February 1, 1946, and January 31, 1956. In its January 14, 1976, order, the Commission also granted defendant's motion for partial summary judgment with respect to an accounting for a right-of-way over the reservation to the Arizona Edison Company, dated March 16, 1951. With respect to an alleged right-of-way of the Southern Pacific Railroad, defendant was directed to supply plaintiff with a copy of any right-of-way agreement with the railroad, and to account for any funds collected pursuant to such agreement.

Notwithstanding defendant's partial summary judgment with respect to the six post-1946 agricultural leases, in posttrial briefing, plaintiff again has asserted a claim for damages for those leases. Plaintiff's effort in this regard is an attempt to reinvigorate claims that the Commission by interlocutory

---

**5.** Docket No. 235 (Ak Chin community), No. 236–B (Gila River Pima-Maricopa community), No. 236–N (Gila River Pima-Maricopa community), and No. 291 (Salt River Pima-Maricopa community).

**6.** Exception No. 1 was: "Government fails to furnish an adequate up-to-date accounting"; No. 2 was: "Government fails to furnish sufficient information to establish that it fulfilled its duty to deal fairly with Indians and to communicate to Indians all material facts of which it knew or should have known in connection with its administration of the trust, including transactions on its own account"; No. 3 was: "Government fails to furnish sufficient information to establish that it fulfilled its duty to exercise such care and skill in the handling of Indians' trust property and property rights as a man of ordinary prudence would exercise in dealing with his own property or property rights and to exercise such greater care and skill of which Government was capable."

**7.** 37 Ind.Cl.Comm. 193 (1976).

**8.** At trial on May 16, 1977, plaintiff waived its claims under exceptions No. 9 and No. 10, with respect to transactions of which it had knowledge.

order had denied. Plaintiff's challenge to the agricultural leasing program alleges the program constituted a substantive failure of the Government as trustee for the Indians to properly manage plaintiff's reservation. It is here considered and ruled upon under the doctrine that, until final disposition, interlocutory decisions made by the Commission from which no appeal was taken may be reexamined.

The issues for decision in this case are as follows:

*Exception No. 1*: Was the lease of part of plaintiff's reservation to T. G. Decker on February 1, 1946, at the fair rental value for an agricultural development lease as of the date it was made? Was the Decker lease part of a continuing policy and program to lease plaintiff's reservation for agricultural development?

*Exception No. 2*: Was plaintiff's reservation when established on May 28, 1912, subject to a right-of-way owned by the Southern Pacific Railroad? If the operation of the railroad was a continuing trespass on the reservation since 1912, how are damages to be measured?

*Exception No. 7*: Has defendant made a full and complete accounting of its administration of plaintiff's funds, assets and property from May 28, 1912, to August 13, 1946, and of any obligations that commenced before August 13, 1946, and continued after that date?

---

Historically, the ancestors of plaintiff were Papago Indians who until approximately 1874 had subsisted as floodwater farmers on lands located around Maricopa Wells, Arizona. The band irrigated lands by floodwaters from the intermittent Santa Cruz River, and sold surplus agricultural products to the stagecoach station in Maricopa Wells. When the land became less productive and the stagecoach line through Maricopa Wells was eliminated, the band settled at Ak Chin, approximately 11 miles south.

The lands historically occupied by this band of Indians were included in the aboriginal territory of the Pima-Maricopa Indians and the band's use of the land was permissive. Aboriginal title to the land on which plaintiff's reservation is located was extinguished at the time the aboriginal lands of the Pima-Maricopa Indians were taken. The Commission determined the taking date was November 15, 1883, for lands which had not been previously entered and taken by white settlers.[9]

The band had lived and farmed at Ak Chin for approximately 38 years when the reservation was established by Executive Order on May 28, 1912. The reservation contains 21,840 acres and includes all of the lands in Pinal County previously occupied by the band. The Ak Chin reservation is located on relatively flat desert terrain. No streams are located on the reservation, and the two washes that cross the reservation— the Ak Chin wash, and the Santa Cruz wash—normally are dry except for a few hours following summer rains. The average annual rainfall on the reservation from 1876 to 1934 was 7.03 inches.

When the reservation was established, the Ak Chin community had a population of approximately 100. In December 1913, there were 105 Indians on the reservation, and in 1962, the town of Ak Chin had an estimated population of 300. Effective August 17, 1961, plaintiff was organized pursuant to the Indian Reorganization Act,[10] and since that date has acted through a tribal council. Prior to its organization in 1961, plaintiff acted by majority vote at meetings of tribal members, with one member serving as chairman.

*Agricultural Development Leases*

The record in this case indicates that, in 1946, the superintendent of the Pima Indian Agency executed two leases for the development of irrigated agriculture on plaintiff's reservation. In that year, also, the

---

9. *Gila River Pima-Maricopa Indian Community v. United States*, 27 Ind.Cl.Comm. 11, 15 (1972).

10. 25 U.S.C. § 476 (1976).

Ak Chin community passed a resolution favoring development of desert reservation lands under improvement leases, and ultimately, a number of development leases were made for 10-year terms starting January 1, 1947. Plaintiff contends all of the leases are products of a wrongful course of Government conduct that commenced prior to August 13, 1946, and seeks $4,721,117.44 in this proceeding as damages for defendant's failure to obtain fair cash rentals in nine leases.

The factual background that applies to both the leasing program and to specific leases of reservation land has not been the product of systematic development in the record. The record is incomplete in many particulars. The Commission ordered a supplemental accounting only on the first lease that was negotiated, the T. G. Decker lease, No. 509. Supplemental accounting was neither ordered nor made on any of the other leases for which plaintiff demands damages.

Although ordered by the Commission to produce a copy of the Decker lease, defendant has not complied. Defendant asserts neither the original nor a copy could be found in its files.[11] As a result, the terms and provisions of the Decker lease are not in evidence as an authenticated exhibit. Further, the record does not contain a copy of the resolution of the Ak Chin community that authorized the Pima Indian Agency superintendent to sign the Decker lease.[12] The parties agree, however, that there was a Decker lease, that it went into effect, and that operations were performed during its term.

In 1946, T. G. Decker owned and was farming three parcels of land that abutted plaintiff's reservation. Decker apparently initiated the discussions that resulted in a lease to develop reservation land. Unlike other development leases of reservation land that were made subsequently, the Decker lease was not the product of public advertising, public auction, or competitive bids.

Information about the Decker lease in the record primarily is derived from an administrative summary provided with defendant's supplemental accounting. This information is enlarged by testimony by the parties' experts and by random references in related documents. The parties are in substantial agreement on the following facts:

The term of Decker lease No. 509 was from February 1, 1946, through January 31, 1956.

Initially, the lease was for 1,840· acres of irrigable land and 63.83 acres of desert land; a subsequent modification increased the irrigable acreage to 1,878.67, and the desert land to 274.33 acres.

Rental was $1 per acre per year for irrigable land, and $0.25 per acre per year for desert land. A lease fee of $42 was paid with the initial payment on February 1, 1946. The total annual rental was $1,947.25, with semiannual payments of $973.63 due February 1, and $973.62 due August 1. During the term of the lease, Decker paid total rentals of $19,472.81.

Decker during the term of his lease installed one well on reservation land. To irrigate his own lands and the 1,878.67 irrigable acres leased on the reservation, Decker used eight or nine off-reservation wells and the one on-reservation well.

The 1,878.67 irrigable acres were improved and developed for irrigated agriculture. Defendant's expert testified that Decker's development expenditures amounted to $45,000.

The record is deficient with respect to the following factual matters about the Decker lease:

Decker's specific performance obligations, relative to such matters as clearing

---

**11.** Plaintiff's counsel represented that he had found a copy and had read it; but he did not introduce it as an exhibit at trial.

**12.** The record does contain a copy of a resolution, adopted Sept. 5, 1946, which approved enlargement of the acreage leased to Decker that states in its recitals that certain land "was leased to T. G. Decker on an improvement lease for a period of 10 years, beginning February 1, 1946, and terminating January 31, 1956."

the land, leveling and drainage improvements, fences, roads, and crop rotation are not in evidence.

Motivation of the parties for the lease, the date it was executed by Decker and the superintendent, and the circumstances of its negotiations are not known.

Evidence of what crops were grown, yields obtained, or rotation practiced is nonexistent or inconclusive.

Expenditures by Decker for well installation and development work are not itemized and the testimony of defendant's expert in this respect is not corroborated by authenticated documentary material.

There is no evidence of fair market values or selling prices for comparable undeveloped land after 1949, and no evidence of such values for comparable developed land during the lease period.

There is no evidence to establish the market value of the leased premises at the end of the lease term. There is no evidence as to access to water necessary for irrigated agriculture the leased premises had at the end of the term.

The information that is in the record concerning the policy and program to lease reservation land for agricultural development is even less direct than for the Decker lease. This information comes into the record as part of a defense to other claims rather than the claim for a general accounting. Much of the documentation relative to the agricultural development program and the specific lease provisions utilized in it is in the record because the documents were attached as exhibits to a consultant's report, prepared at defendant's request, that compared the State of Arizona agricultural leasing program to the Ak Chin community agricultural leasing program.[13] As a result, there is no direct testimony in the record on the parties' development and participation in the leasing policy and program, and the

parties have failed to incorporate documentation in the record that would show compliance with administrative formalities and performance obligations.

Prior to March 5, 1946, the Ak Chin community had not authorized a program to develop reservation lands for irrigated agriculture by means of improvement leases. Although a copy of the authorizing resolution is not in the record, copies of subsequent documents indicate that a meeting of tribal members was held on that date and a program was approved on that date.[14]

The Decker lease had a term that commenced February 1, 1946, and presumably was executed before that date. There is no evidence in the record that would support a conclusion that the Decker lease was executed after the March 5, 1946, community meeting, and the record supports the conclusion that the Decker lease became effective prior to the adoption of a policy and institution of a program to develop reservation lands under improvement leases. The Fuqua lease, No. 531, was the product of procedures set in motion by the new policy.

Before the policy was implemented, the Pima Indian Agency sought and obtained approval from the Chicago office of the Indian Bureau. By letter dated April 4, 1946, the Pima Indian Agency land clerk reported that, on March 29, 1946, the Indian Office had authorized the Agency "to proceed with advertising the lands at Maricopa (Ak Chin) Indian reservation for cash improvement lease[s]." This approval was reported to eight individuals, some of whom subsequently became lessees of reservation lands.

The Pima Indian Agency superintendent, A. E. Robinson, formally advertised that four units of the reservation would be offered for lease, at public auction or on sealed bids, on May 21, 1946. The bid invi-

13. Defendant's exhibit No. 65.

14. The certificate, entitled "Council Proceedings" attached to a lease executed on June 22, 1946 (the Fuqua lease, No. 531) and a resolution adopted Sept. 5, 1946, that approved amendment of the Decker lease, recite the Ak Chin community had a meeting on Mar. 5, 1946, which adopted a resolution that authorized the Pima Indian Agency superintendent to enter such leases for terms not to exceed 10 years.

tations were sent to 11 individuals and corporations and to six postmasters in communities in Arizona. The four units advertised were described as Units 2, 3, 4 and 5,[15] and conditions that would be included in lease contracts the successful bidder would be required to enter with the Government and the Indian lessors were specified in detail. The program included the following:

1. Leases were to be for a 10-year term, from January 1, 1947, to December 31, 1956. All land suitable for irrigation was required to be placed in cultivation by the lessee.

2. Consideration for the lease contained two elements: (a) a cash rental per acre; and (b) the installation of irrigation wells and subjugation of the land by clearing, leveling, fencing, and other acts to place the land under cultivation.

3. Minimum cash rentals were: $1 per acre per year for lands to be put under cultivation; and $0.25 per acre per year for nonirrigable lands.

4. The number of wells a lessee would be required to install for each unit, and the unit acreage, was:

| | Acres | Wells |
|---|---|---|
| Unit 2 | 954.25 | 2 |
| Unit 3 | 1346.15 | 2 |
| Unit 4 | 800 | 1 |
| Unit 5 | 1636.86 | 2 |

Wells were to be not less than 20 inches in diameter to a depth of not less than 450 feet. The lessee was authorized to drill additional wells at his own expense.

5. Detailed requirements for subjugation of the land were described in additional provisions as indicated by the following captions: "Clearing," "Leveling and Drainage," "Fences," "Roads," "Crop Rotation," and "Benefits under Agricultural Program." The provision captioned "IMPROVEMENTS WHICH MAY NOT BE REMOVED FROM THE LAND" stated:

> All improvements in connection with fences (including corrals), roads (including bridges and other structures), and irrigation system, which shall include wells, ditches, irrigation structures, transformer stations (transformers and equipment), shall remain on the land at the expiration of the lease and shall become the property of the Lessors. All other improvements placed thereon by the Lessee shall remain the property of the Lessee, provided he has made all cash payments and has otherwise complied with the conditions of the lease, and may be removed within the period of thirty days after expiration of the lease.

At the May 21, 1946, bid opening, it was ascertained that no bids were submitted for Unit 2 and that Harry B. and R. Howard Fuqua had submitted a bid on Unit 3 at the minimum cash rental. There is no information in the record relative to bids for Units 4 and 5.

Unlike the Decker lease, the provisions of the Fuqua lease are in the record.[16] The lease was executed on June 22, 1946, for a 10–year period from January 1, 1947, through December 31, 1956. The cash rental payment was $1 per acre per year for 1,218.9 acres of irrigable land, and $0.25 per acre per year for 129 acres of uncultivated desert land.[17] The Fuqua lease incorporates minor modifications to the conditions that had been advertised.[18]

15. A map attached to the advertisement showed Units 1 through 5; Unit 1, as shown on the map, described the area that had been leased to Decker.

16. Pursuant to the Commission's Jan. 14, 1976, order, defendant was not ordered to provide plaintiff a copy or to make a supplemental accounting for the Fuqua lease. A copy is in the record because it was an attachment to another exhibit.

17. Lease No. 531—Contract No. 1–72–IND–6141.

18. The lease required two irrigation wells to be drilled, and authorized the Fuquas to drill additional wells on reservation land at their own expense. If the Fuquas drilled such additional wells, they were to be capped, but the machinery and equipment remained their property and could be removed at the end of the term. The Fuquas were permitted to use irrigation water from off-reservation sources. The Indians and

Pursuant to the March 5, 1946, policy and program, leases were made for the four parcels of reservation lands that had been advertised. Subsequently, other parcels on the reservation also were leased for agricultural development. The record does not establish when these additional leases were negotiated or executed. None became operative, however, before January 1, 1947, or subsequently.

The Fuqua lease was executed by the Pima Indian Agency superintendent and by the Fuquas prior to the August 13, 1946, jurisdictional cutoff date for a term that commenced on January 1, 1947. It specifically required approval by the Secretary of the Interior, and applicable regulations at that time had not delegated final approval authority to the superintendent. There is no evidence that the Fuqua lease was approved by the Secretary. The change in Department regulations that authorized agency superintendents to execute and approve agricultural leases without regard to the amount of annual rental did not become effective until September 11, 1946.[19] In these circumstances, the Fuqua lease was not an operative or binding obligation prior to the August 13, 1946, cutoff.

The January 14, 1976, order of the Commission found that neither the Fuqua lease, nor any of the subsequent leases, were within the August 13, 1946, jurisdictional cutoff. Defendant was not ordered to produce copies of those leases or to render a supplemental accounting in this proceeding for them. In summary, defendant has been required to render a supplemental accounting only for the Decker lease, and the only document in the record for a lease that resulted from the March 5, 1946, program is the Fuqua lease. Plaintiff's assertions as to what was required by the provisions of any of the other agricultural leases, *i.e.*—length of term, rental, acreage, number of wells, lessee obligations, etc.—are not established on the record.

Plaintiff contends the March 5, 1946, policy was formulated by defendant, and that

all of the leases, including the Decker lease, were the product of a continuing wrongful course of conduct that commenced before August 13, 1946. The wrong, according to plaintiff, is that defendant ignored local agricultural leasing practices and injured plaintiff by promotion of an unreasonable program. Local practice in Pinal County, plaintiff says, had agricultural leases on a cash basis used only for short-terms (3 years or less); when long-term leases were made, the local practice would have them on a sharecrop basis. Defendant's program had a long-term lease of 10 years at a fixed annual rental, and, therefore, was both imprudent and contrary to local practice. In addition, plaintiff asserts the $1 per acre per year cash rental was grossly inadequate, that defendant failed to assure installation of wells in adequate numbers to allow irrigation of the land at the end of the lease term, and that so-called agricultural improvements in subjugating the land were illusory.

Plaintiff further asserts that it should be compensated in damages for defendant's failure to account for a lease program in which defendant, as a fiduciary, was obligated to obtain fair rental values for the leased parcels. Plaintiff contends defendant owes $1,028,028.54 on the Decker lease, and a total of $4,721,117.44 on all leases.

Plaintiff's claim on the agricultural leases has two divisions. First, plaintiff challenges defendant's failure to render such an accounting, in the form and with the content, as would be appropriate for a fiduciary managing trust property. Second, plaintiff seeks to recover damages for the Government's failure as a trustee to administer Indian reservation property in accordance with fiduciary standards, and such damages would be measured by the rentals that should have been collected by a faithful trustee.

The Government's obligation to account to the Indians for funds and property is not commensurate with its obligation to super-

---

the reservation, however, did not acquire water or other rights to such sources of water.

**19.** 25 C.F.R. § 01.130(b)(1) (Supp.1946).

vise and administer Indian affairs and reservations. The special relationship between the Government and a particular group of Indians may present situations where the general law of fiduciary obligation defines the rights of the parties. This does not mean, however, that all of the rules that govern private fiduciary relationships apply fully to claims by an Indian group against the Government. The failure of the Government to render an accounting in the form required of a fiduciary is not sufficient, in and of itself, to establish liability.[20]

■ The special relationship that plaintiff has with the Government is not an express trust created by particular provisions of any treaty, agreement, Executive order, or statute. The Executive order that established plaintiff's reservation specified no particular legal relationship and created no express obligation. The trust or fiduciary relationship plaintiff has with the Government arises not from the specific terms of a document; it exists because defendant has assumed control and supervision over plaintiff's money and property. Plaintiff's rights and defendant's obligations arise from the creation of the reservation, and defendant, as regards its dealings with Indian reservation property, is a trustee.[21]

■ Plaintiff's claim for mismanagement of its reservation by an improvident agricultural lease program is brought under the Indian Claims Commission Act, and sovereign immunity has been waived for any breach of the trust relationship that can be established thereunder.[22] Where a trust relationship between Indians and the Government is established, the Government's actions normally are judged according to standards established in traditional trust

law doctrine. The standard of duty as trustee for Indians is not mere reasonableness, but the highest fiduciary standards.[23] Where losses result from a breach of trust in mismanagement of tangible trust property, the trustee is liable in damages.[24]

■ In 1946, plaintiff had not yet been organized pursuant to the Indian Reorganization Act; it operated through majority vote at membership meetings. The agricultural leasing program, as a practical matter, could not be administered by plaintiff; the management functions necessarily had to be performed by the Government through the superintendent of the Pima Indian Agency. As the Indians' trustee, defendant is obligated to make a proper trust accounting and is accountable in damages for breach of trust.

Defendant's compliance with its accounting obligations are discussed separately below. It is sufficient to note here that the 1971 GSA report was not a satisfactory trust accounting for the 1883–1951 period it purported to cover. Nor is the supplementary accounting for the Decker lease, submitted pursuant to the Commission's order, adequate to discharge the trustee's obligation to account. The Commission ruled defendant had no obligation to account for any of the post-March 5, 1946, leases plaintiff challenges because they were beyond its jurisdictional time constraints. Inasmuch as the Fuqua lease, although executed, did not become operative by August 13, 1946, and as it has not been shown that any of the other leases were either executed or became operative before January 1, 1947, the Commission's denial of an accounting as to those leases was correct as a matter of law unless plaintiff can show that the

---

20. *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. ——, ——, 624 F.2d 981, 988 (1980).

21. *Cramer v. United States*, 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923); *Coast Indian Community v. United States*, 213 Ct.Cl. 129, 152–54, 550 F.2d 639, 652–53 (1977).

22. *United States v. Mitchell*, 445 U.S. 535, 540 n.2, 100 S.Ct. 1349, 1353 n.2, 63 L.Ed.2d 607 (1980).

23. *United States v. Mason*, 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973); *Cheyenne-Arapaho Tribes v. United States*, 206 Ct.Cl. 340, 345, 512 F.2d 1390, 1392 (1975).

24. *Navajo Tribe v. United States*, 176 Ct.Cl. 502, 364 F.2d 320 (1966); *Klamath & Modoc Tribes v. United States*, 174 Ct.Cl. 483 (1966).

March 5, 1946, program amounted to a breach of trust and constituted a wrong that continued after August 13, 1946.

■ Plaintiff did not present evidence, either by testimony or by documentary exhibit, to establish the adoption of an improper leasing program or to challenge its implementation. Plaintiff's evidence was limited to a proper valuation of the Decker lease. Notwithstanding the deficiencies in plaintiff's proof, the record does support a conclusion that a policy and program to develop irrigated agriculture on the reservation was authorized on March 5, 1946, and that the program was successful. The Commission noted "after the plaintiff's reservation had been developed by lessees between 1947 and 1957, it became a very profitable tribal farming operation as the Ak Chin Farms." [25] Plaintiff has not established that the March 5, 1946, policy and program constituted a continuing wrong that commenced before the jurisdictional cutoff date.

Development of unimproved reservation land for irrigated agriculture involves a series of actions that produce significant changes in values. First, the land must be "subjugated" (cleared, leveled and bordered, and irrigated by means of appropriate dikes, channels, ditches, and control structures) and a source of water provided. These improvements require substantial capital investments and 1 or 2 years to complete. [26] In the first year of the lease although there would be some production, little could be expected and full production would not be reached until the end of the second year.

When a lease program is commenced and leases are negotiated, land values are based on unimproved and unwatered land. At that time, land values and rentals necessarily are low. After the land is subjugated, however, value of the land to the lessee is increased dramatically. The lessee, accordingly, has substantial expenditures in the early years with respect to unproductive land. In later years, mainly operating expenses are involved on land that is productive and valuable. The value of the lease to the lessor is a combination of the cash rentals paid and the improvements installed.

The March 5, 1946, program advertised a required minimum cash rental; the amount of rental that ultimately would be paid, however, with respect to any particular lease was the product of formally advertised competitive bids. If the agricultural improvement leases on reservation lands were worth more than the minimum cash rental plus the improvements specified by the Government, the competitive bid process was relied upon to establish such additional values. In these circumstances, defendant did not adopt an imprudent policy, nor did the program, as conceived, provide for leases of lands at less than adequate cash rentals. Cash rentals established in the Fuqua and subsequent leases were the result of formal advertising and competitive bids, either by personal appearance or by sealed bids. Plaintiff does not allege that either the publicity or the bidding process was unfair, unreasonable or wrongful. [27]

---

25. *American Indians Residing on the Maricopa-Ak Chin Indian Reservation v. United States,* 31 Ind.Cl.Comm. 384, 388 (1973). The Commission also found that the irrigation projects were intended to benefit plaintiff and that defendant had no prior obligation to develop an irrigation system.

26. The Fuquas expended approximately $40,000 for two wells and $14,715 for clearing, leveling and ditching on their lease.

27. The Arizona State Land Department had a concurrent program to develop irrigated agriculture by improvement leases. Defendant introduced a report by a consulting hydrologist that shows the State of Arizona had income from agricultural leases of 283,063.60 acres, during the 1947–48 fiscal year, that totaled $89,000.42, or an average of $0.314 per acre. For comparison, the report shows that the Fuqua lease paid a rental of $1 per acre per year for 1,218.9 acres of irrigable land and $0.25 per acre per year for 129 acres of desert land; improvements made by the Fuquas that remained with the lessors totaled $59,266.50; and the net value received by the Ak Chin Indians averaged $4.40 per acre per year during the 10–year life of the Fuqua lease.

Plaintiff's assertions concerning the impropriety of the agricultural leasing program are derived from the testimony and report of its agronomy expert.[28] Dr. Barr's report and testimony are cited by plaintiff to establish "customary" practice in Pinal County, Arizona, in agricultural leases. Plaintiff's assertions as to a customary practice relative to agricultural development leases are not supported in the record.

Dr. Barr's testimony and his documentary materials were concerned with leasing practices that apply to improved and developed "pump lands" that had been put into irrigated cultivation in the Casa Grande Valley of south-central Arizona. No showing was made of the terms that normally would be expected to apply to a lease of undeveloped land that provided both a cash rental and specified improvements.

With respect to leases of improved irrigated land, Dr. Barr testified that cash leases were associated with short-term leases of 3 years or less. Frequently, provision was made for the cash payment to be established annually on the basis of the prior year's experience. Sharecrop leases normally would be used in long-term leases, and would be on a 50–50 basis or a ¾ to ¼ share basis. In a sharecrop lease, the landlord would furnish the land and pumping facilities or water rights; the tenant would supply farm equipment and labor. Cash costs such as fertilizer and insecticides were divided between the landlord and the tenant in accordance with respective shares.

In Pinal County, according to the record, there was no "customary" leasing practice even with respect to improved farmland, and leasing practices relative to undeveloped farmland varied extensively. Dr. Barr's report shows that, in 1939, there were 330,455 acres in farm units, with 101,020 acres producing crops in the Casa Grande Valley.[29] Approximately ¾ of the farm acreage was leased: about 40 percent on a cash basis; 20 percent on a 50–50 share basis; and the remaining 40 percent under a number of different types of leases. Cash leases largely were associated with smaller private ownerships. Seventy percent of the cash leases applied to units of less than 110 acres. Share leases, on a 50–50 basis, largely applied to land ownerships ranging in acreage from 210 to 1,710 acres.

In 1939, cash leases on private land ranged from $5 to a high of $22 per acre for land with a high AAA cotton allotment. Some development leases included payment of a nominal annual fee of less than $3 per acre. State lands were leased on a cash basis, rental rates were either 1, 1.5, 3, or 5 cents or $1 per acre.

The March 5, 1946, lease program, and the Decker lease, involved undeveloped land in an area of Pinal County that differed from the "pump lands" described by Dr. Barr. The cash lease and sharecrop lease arrangements described by Dr. Barr were not shown to be a customary leasing practice for the type of improvement leases needed and utilized in the March 5, 1946, program on plaintiff's reservation.

Plaintiff also attacks the March 5, 1946, leasing program for failure to require an adequate number of wells to permit continued use of the land after the termination of the leases. The one well required for 1,878.67 irrigable acres in the Decker lease, and two wells for the 1,218.9 acres on the Fuqua lease, allegedly show maladministration because, according to plaintiff, one well can irrigate properly not more than 320

---

28. Plaintiff's expert, Dr. George W. Barr, was a respected specialist in agronomy, who from 1930 to 1957, had been associated with the Agricultural Extension Service, College of Agriculture, University of Arizona, and was editor of the Arizona Agricultural Bulletin. He did not testify at the May 16, 1977, trial; his deposition was taken Apr. 28, 1978. His report, deposition and deposition exhibits were admitted in evidence by the Feb. 27, 1979, order closing proof.

29. "Agricultural Land Ownership and Operating Tenures in Casa Grande Valley." Greisinger and Barr, 1941. Private ownership accounted for 117,300 acres of the farmland and 65,590 acres of the land producing crops; the State of Arizona held 13,700 acres of farmland and 7,120 acres producing crops; federal agencies held 199,400 acres of farmland, with 28,270 acres producing crops.

acres. Defendant does not contest the 320 acre standard.

From documents in the record, it appears the March 5, 1946, leasing program allowed considerable flexibility in the source of water needed to satisfy the lessee's obligation to subjugate and place in cultivation all of the leased lands that were suitable for agriculture. A specified number of wells were required to be installed on each lease unit. The program, in addition, permitted the lessee to use water from nonreservation sources, and, at lessee's option, to drill additional wells on the reservation at lessee's expense. Unless specifically excluded, the machinery and well equipment for any additional wells would belong to the Ak Chin community at the end of the lease term. If machinery and equipment were permitted to be moved, as in the Fuqua lease, the community received the additional wells, suitably capped for protection.

The formal advertisement for Units 2, 3, 4, and 5 specified a total of seven wells for the 4,610.01 irrigable acres. At 320 acres per well, 14 or 15 wells would have been required if all of the lands were to be irrigated with water from reservation sources. The number of wells actually required by the lease documents for Units 2, 4, and 5, and for the subsequent additional units leased, is not in the record.

At his deposition, Dr. Barr used a map of the Ak Chin reservation that showed the irrigation wells and leased lands as of April 1953. According to this map, the March 5, 1946, program had resulted, by 1953, in the lease of 11 parcels, exclusive of the parcel in the Decker lease, that included a total of 9,138.89 acres. At 320 acres per well, these parcels would have required 28.5 wells if all of the lands were to be irrigated with on-reservation water. The map shows 22 irrigation wells in fact were installed. This number would be adequate, on the basis of one well per 320 acres, to irrigate 76 percent of the land that had been subjugated.

The record is silent as to the feasibility of providing additional water from nonreservation sources. Enlargement of the 22 existing wells by the Indians after the termination of the leases would be possible.

The March 5, 1946, program required the lessee to subjugate all of the irrigable land included in the lease. To obtain this commitment, the program permitted the lessee to obtain and use water from nonreservation sources. In these circumstances, defendant's failure to require more wells does not establish the program was imprudent, nor that the trustee had breached the trust. Through the leasing program, the Ak Chin community had its irrigable lands subjugated and each parcel, except the 125 acres leased to Norton, had access to water.

Plaintiff also challenges the 10–year lease term established in the program. A development lease requires a term of sufficient length to assure the lessee may recapture subjugation costs and to provide the attraction of a reasonable profit. While a short-term cash lease, or a long-term sharecrop lease, may be attractive with respect to land that has been improved and has a productive history, such leases have little attraction for the development of unimproved lands on a remote reservation. A 10–year lease at a fixed annual rental, in the context of agricultural development of plaintiff's unimproved reservation, is not demonstrably so imprudent as to amount to a breach of trust. This court has approved as reasonable an agricultural development lease for a term of 5 years when the consideration did not include any cash rental component.[30] At the time the March 5, 1946, leasing program was initiated, Interior Department regulations applicable to leases of Indian land authorized a term of 10 years for irrigable lands.[31] A 10–year lease of Indian lands also has statutory recognition.[32]

**30.** *Gila River Pima-Maricopa Indian Community v. United States*, 199 Ct.Cl. 586, 591, 467 F.2d 1351, 1354 (1972).

**31.** 25 C.F.R. § 171.1 (1938). A term of this length has continued to be permitted. 25 C.F.R. § 171.6 (1956); 25 C.F.R. § 131.8 (1980).

**32.** 25 U.S.C. §§ 402(a), 477 (1946).

In summary, the record establishes that prior to August 13, 1946, a policy had been initiated and a program had been started to lease parcels of plaintiff's reservation for irrigated agricultural development. Although the record with respect to the March 5, 1946, lease policy and program is seriously deficient, the program does not appear to have been unfair to the Ak Chin community. Plaintiff has not established the program constituted a continuing wrong that would require, in this proceeding, an accounting for the Fuqua and subsequent leases.

■ The Decker lease was a separate undertaking that preceded the March 5, 1946, agricultural leasing program. It may have been instrumental in motivating the Indians to adopt the March 5, 1946, resolution. The Decker lease was the product of private negotiations. Public advertising and competitive bidding did not establish the rental payment, number of wells to be installed, or the 10–year term of the Decker lease. The lease document that defines the rights and obligations of the parties is not in evidence, but all parties agree the term of the Decker lease started February 1, 1946. The parties also agree that the leases that implemented the March 5, 1946 program were for terms that started January 1, 1947, or subsequently.

The main efforts of each party in the accounting trial, relative to the Decker lease, were directed to its valuation; each presented testimony and reports from expert witnesses for this purpose. In their briefs, and in the reports and testimony of their experts, neither party has applied the experience gained and criteria established by this court in an appeal from Indian Claims Commission rulings on agricultural leases on the reservation of the Gila River Indian Community (GRIC).[33]

The GRIC case is informative because the leases there were from 1942 to 1947 on reservation land in Arizona in the same county as plaintiff's. The reservations are comparable in many physical characteristics. The same individual, A. E. Robinson, the superintendent of the Pima Indian Agency, negotiated and executed both the GRIC leases and the Decker lease.

The GRIC leases included: (a) parcels of developed land used for irrigated cultivation; (b) parcels of undeveloped land suitable for subjugation and irrigated cultivation; and (c) parcels of desert land suitable only for grazing. The court approved a rental of $20 per acre per year plus a water charge of $3.60 per acre for the land developed and under cultivation on a representation that such rental was the customary rate for such land at that time. With respect to the parcels of undeveloped land suitable for irrigation, the court approved a 5–year term lease, with no cash rental component. Subjugation of the land and the provision of irrigation machinery and well equipment was considered to be adequate and fair compensation. The court specifically rejected as unreasonable a rental of $0.25 per acre per year as a measure of damages for failure to subjugate irrigable land and approved a $1 per acre rental for noncultivatable desert land used for campsite dormitories.

Plaintiff's valuation of the Decker lease was based upon Dr. Barr's conception of a correlation between the value of crops grown and the selling price of lands in the Salt River Project. This correlation was applied to land values in the Coolidge-Eloy-Casa Grande area of Pinal County. Dr. Barr computed the net return per acre to a landlord for that part of his land growing short staple cotton lint in the Coolidge-Eloy-Casa Grande area for each year in the period 1928–56.[34] Plaintiff's counsel ap-

---

**33.** *Gila River Pima-Maricopa Indian Community v. United States, supra* note 30. The GRIC was represented by the same counsel as plaintiff here. The court specifically rejected the proposed valuation that would have included compensation for lost potential profits and would have permitted consequential damages.

**34.** Dr. Barr assumed that on larger farms, $2/3$ of the cultivated land would be planted in cotton. His net return per acre for each year was computed as follows: (1) the yield in pounds per acre of short staple cotton lint was obtained from published Arizona agricultural statistics;

plied this amount to the total acreage leased to Decker and found that the total rental payments owed on the lease were $1,033,870.60. Plaintiff's calculations excluded a rental for the first year to compensate for development costs. The amount owed, therefore, was exclusive of all benefits from well installation and subjugation.

Even if it is assumed that Dr. Barr's concept of a net return to the landlord on that part of land growing cotton has application in a determination of a rental for the Decker lease, plaintiff's computation of the total net cash rental owed on the Decker lease contains numerous errors. It was based on the total number of acres leased to Decker (2,153)—only 1,878.67 acres were irrigable and 274.33 acres of desert land should be excluded from the total; rentals for the years 1956 and 1957 were included, even though the Decker lease expired January 31, 1956; further, only ⅔ of the irrigable land was cropped to cotton under Dr. Barr's analysis, which would reduce the 1,878.67 acres of irrigable land by ⅓, or 626.22 acres.

Plaintiff also failed to give credit for the $19,472.81 rental payments admittedly paid by Decker. Plaintiff's final computation on the Decker lease recognizes $5,842.06 in receipts and claims $1,028,028.54 as the amount owed.

In addition to its obvious errors, plaintiff's calculation of a valuation based on concept of net return to the landlord for the Decker lease must be rejected as improper in principle. Net returns to a landlord, projected over the lease term and based on previous years' crop values provide no assistance in a determination of a fair rental for the Decker agricultural improvement lease. Compensation for lost potential profits and for personal and consequential damages are not normally allowable for breach of a lease-type agreement.[35] This court has repeatedly rejected hindsight analysis that provides for potential profits that might have been earned from different management of Indian lands.[36] Plaintiff's computation of rentals for the Decker lease gives special advantages for increases in cotton prices that could not be anticipated at the beginning, and for, unforeseen increased yields due to improved use of fertilizer and insecticides during the term of the lease.

Defendant's expert, Everett W. Fenton, a professional real estate appraiser, determined a fair rental value for the Decker lease by use of a variation of a method previously approved by the court.[37] Defendant's expert first determined a fair market value for the land on the basis of comparative sales; to this value he applied a rate of return to obtain the annual rental value. Mr. Fenton's method is useful to establish a value as of the beginning of the lease period. It does not, however, take into account increases in land values due to inflation during the term of the lease, or for the increased value that results from subjugation and improvement of the land in the early part of the lease.

Notwithstanding the frequency of agricultural leasing arrangements in Pinal County in 1946, Mr. Fenton was unable to

(2) a price in cents per pound was determined from published sources; (3) yield times price gave value of short staple cotton lint per acre in dollars; (4) the landlord's gross return was determined on an assumed sharecrop arrangement of one bale to the landlord and three bales of cotton to the lessee at the gin; (5) net return was determined by deducting from the landlord's gross return: interest and depreciation on well pump and motor installations, land tax, and (for 1954–56) ¼ of fertilizer and insecticide costs.

**35.** *Gila River Pima-Maricopa Indian Community, supra* note 30, 199 Ct.Cl. at 594, 467 F.2d at 1356.

**36.** *Tlingit & Haida Indians of Alaska v. United States,* 182 Ct.Cl. 130, 389 F.2d 778 (1968); *Sioux Tribe of Indians v. United States,* 146 F.Supp. 229 (1956).

**37.** *Lower Sioux Indian Community v. United States,* 30 Ind.Cl.Comm. 463 (1973), aff'd, 207 Ct.Cl. 492, 519 F.2d 1378 (1975). This was a taking case, concerned with determination of the rental value of land used as a military installation from 1867 to 1890. The median date of loss was assumed to be 12.5 years after the beginning of the taking.

locate examples of agricultural improvement leases in the period 1941–50 that could be compared with the Decker lease. He did locate, in the Pinal County records, a minimal sample of 19 sales of farmlands in this period which he considered to be comparable.

The 19 comparable sales located by Mr. Fenton ranged in value from $1 to $20 per acre, with an average of $7.98 per acre. After adjustments, for Government tax and patent sales, and for sales of abutting land, Mr. Fenton concluded that land leased to Decker had a fair market value in February 1946, of $12.50 per acre. To derive a rental value, he applied a 7 percent return factor [38] to produce a per acre yearly rent of $0.88 for the irrigable acreage. Mr. Fenton believed there was no rental market for nonirrigable land, and he assigned no rental value to the 274.33 nonirrigable acres leased to Decker.

Defendant's expert determined the discounted value of the $45,000 Decker was assumed to have expended amounted to $1.06 per acre per year and concluded that the Decker lease provided the Ak Chin community a total value that was equivalent to an annual rental of nearly $2 per acre. He therefore concluded that the Indians had received more than a just and fair rent for the Decker-leased property. This conclusion was supplemented by the observation that the Decker lease, as a stimulus to other farmers to participate in improvement leases on the reservation, was beneficial to the Indians' entire land ownership.

There are several deficiencies in Mr. Fenton's valuation procedure. No provision is made to determine changes in values during the term of the lease because the land has been subjugated and improved; the starting value is based upon a lease of unimproved land and that value is applied throughout the term of the lease. Mr. Fenton's appraisal report does not make clear how the lands compared were being used at the time the sales occurred. The sample compared (19) is a limited number, and the size of the sample reduces accuracy.

Mr. Fenton failed to indicate criteria used for comparability, which results in anomolous factual relationships. Sales Nos. B–11 and B–14, for example, each consisted of 320 acres of farmland; No. B–11 was a sale on June 21, 1944, at a per acre price of $21.88; sale No. B–14 was made on June 17, 1945, and had a per acre price of $3.21. These sales are reported as comparable with no discussion for a reason as to the disparity of the price. Location probably did not contribute to the price disparity because less than a year after sale No. B–11 was made, the State of Arizona in sale No. B–13 sold 160 acres located less than 1 mile from B–11 at $2.19 per acre. Mr. Fenton identified three sales (B–2, B–6, B–17) as abutting. In fact, sale No. B–17 did not abut the Decker premises. The land in sales Nos. B–15 and B–18, however, did abut; but they were not noted as having been given special consideration.

The valuation recommended by each expert is flawed by defective procedures. These deficiencies are sufficient to justify that a separate valuation of the reasonable rental for the Decker-leased premises be made on the basis of available information.

In this separate valuation, sales of land that abut the leased premises are considered to be superior for purposes of comparison. There were four such sales: B–2 in 1944 at $17.56 per acre for 2,050 acres; B–6 in 1941 at $12.50 per acre for 320 acres; B–15 in 1944 at $12.50 per acre for 160 acres; and B–18 in 1949 at $20 per acre for 75 acres.[39]

Sale B–2 in area closely compared with the 2,153 acres rented to Decker, and its value in 1944 would not have been lower than the value the leased land would have had in 1946. The $17.56 per acre price of

---

**38.** This 7 percent factor was based on a consideration of yields in 1946 from corporate and municipal long-term bonds (2.45 percent) and United States Government bonds (2.19 percent), adjusted upwards by 2 percent for liquidity, 2 percent for management, and 1 percent for expenses.

**39.** B–6, B–15, and B–18 were sales to Decker.

sale No. B–2 is accepted as a minimum for the fair market value of the land leased to Decker. Sale No. B–18 was made in 1949 for a small parcel of 75 acres. The $20 per acre value reflects inflationary impact to 1949 and is used as a measure of the maximum value the leased premises could have at the start of the lease. The average per acre value of the four sales was $16.70 per acre. This is considered to be the fair market value of the leased premises for the first 2 years of the term when the land is being subjugated and improved for irrigation. Defendant's expert's yield factor of 7 percent is adopted for use to convert the fair market value to a fair rental value. This produces a rental value of $1.17 per acre for the first 2 years for the irrigable acreage in the Decker lease.

There is no information in the record that would provide a fair market value on the basis of comparable sales for subjugated and improved land on the Ak Chin reservation during the last 8 years of the Decker lease. In 1972, this court affirmed a finding of the Indian Claims Commission that $20 per acre per year, plus an operation and water charge of $3.60 per acre per year, was a fair and adequate rental for 6,977 acres of irrigated land under cultivation on the Gila River Pima-Maricopa reservation during the period October 1942 through October 1947. This rental had been negotiated by superintendent A. E. Robinson and was his assessment of the maximum rate per acre paid in the area for irrigated land under cultivation.[40] In the absence of comparable sales information in the record, and in consideration of the location of land on the Ak Chin reservation and the value approved by the court for land on the Gila River Pima-Maricopa reservation, a rental of $10 per acre per year is accepted as a fair, adequate, and just compensation for the lease to Decker of plaintiff's land during the last 8 years.

At $1.17 per acre for 2 years and at $10 per acre for 8 years, the 1,878.67 irrigable

acres would have produced rental income of $154,689.69 for the term of the lease. The $0.25 per acre for the 274.83 acres of nonirrigable land produced a rental of $685.83 for the 10–year term. The total rental should have been $155,375.52, which, when reduced by the $19,472.81 paid by Decker, results in an underpayment to which plaintiff is entitled of $135,902.71.

No adjustment is made to credit defendant for contributions attributable to investments made by Decker during the term of the lease. Defendant's accounting has failed to establish the amounts Decker actually expended to subjugate the land and to provide water and defendant is penalized for this failure. Any benefit to plaintiff as a result of this penalty is warranted by defendant's failure to account and to establish such costs by proof.[41]

### Southern Pacific Railroad Right-of-Way

The Southern Pacific Railroad mainline track crosses plaintiff's reservation at two separate locations, the extreme northern tip and the extreme northeastern tip, for a total length of 2.31 miles. Plaintiff's transportation expert, W. J. Whisnant, determined, from reports the Southern Pacific filed with the Interstate Commerce Commission, that the Southern Pacific Railroad during the period 1921 through 1946 transported across the reservation 163,233,703 tons of freight, and, during the 1926–45 period, 16,362,725 passengers. Mr. Whisnant testified that a fair and reasonable charge for use of land where the railroad has no right-of-way would be $377,069.70 for that amount of freight traffic and $75,-569.34 for the passenger traffic. Plaintiff's total claim for the use of the reservation land by Southern Pacific is $452,639.04.

Plaintiff's claim is based on the assertion that no right-of-way exists legally and that the Southern Pacific Railroad crossings over the reservation constitute an unauthorized and illegal trespass. Defendant is claimed to be liable as trustee for permit-

**40.** *Gila River Indian Community v. United States*, 25 Ind.Cl.Comm. 260, 264 (1971).

**41.** *Washington v. Confederated Tribes of the Colville Reservation*, 447 U.S. 134, 157–58, 100 S.Ct. 2069, 2083–84, 65 L.Ed.2d 10 (1980).

ting use of reservation land without legal justification.

The Southern Pacific Railroad line over the land that subsequently became plaintiff's reservation was constructed when Arizona was a territory. Although the construction dates for the portions on plaintiff's reservation are not established explicitly on the record, the railroad had been built to Maricopa Station (now designated as Heaton) by April 28, 1879, and was to Tucson, Arizona, by March 20, 1880. The railroad had been in operation over 32 years when the reservation was created.

The May 28, 1912, Executive Order that set apart plaintiff's reservation specifically provided "that nothing herein shall affect any valid existing rights of any person." At that time the Southern Pacific Railroad of Arizona had obtained and was operating over a valid right-of-way within the boundaries so set aside. This right-of-way had been obtained by the Southern Pacific Railroad pursuant to the procedures established by Congress in 1875 to grant rights-of-way to railroads through the public lands of the United States.[42]

Defendant's proof of the establishment of this right-of-way has been confused and incomplete. In its March 15, 1976, response to the Commission's January 14, 1976, order to account for the right-of-way, defendant asserted "no such right-of-way exist[s]" on the basis of a report from GSA that no agreement between the railroad and the United States could be located in the Government's archival records and there was no record of any collections having been made on such an agreement.[43] At the May 16, 1977, trial, defendant's proof that the right-of-way had been granted was lim-

ited to two plats, entitled "Status of Public Domain Lands and Mineral Titles," that depicted the Southern Pacific Railroad rights-of-way over the land that was included in plaintiff's reservation. These plats showed a June 3, 1880, notation for sections 15 and 16 in Township 5 South, Range 4 East, and a December 19, 1879, notation for section 18, Township 4 South, Range 3 East. At trial defendant also produced evidence and expert testimony, as an alternative position if the Commission did not accept its legal position, as to the value of a right-of-way on the assumption there had been a taking on May 28, 1912. Defendant attached to its posttrial brief certified copies of profiles of sections of its road which the Southern Pacific Railroad of Arizona had filed pursuant to the 1875 Right-of-Way Act. These profiles show a December 19, 1879, approval by the Secretary of the Interior of a right-of-way through section 18, Township 4 South, Range 3 East, and June 3, 1880, approval through sections 15 and 16, Township 5 South, Range 4 East.

Plaintiff does not challenge defendant's evidence as a failure to comply with the filing requirements of the 1875 Right-of-Way Act. Plaintiff objects that defendant's production of such evidence is untimely and unfair. Plaintiff asserts it should be allowed to rely on the answer given to the January 14, 1976, order, and that defendant's evidence should be excluded under the rules of this court.[44] Plaintiff's objections are without merit.

■ The procedural rules of this court do not apply to the administrative actions that occurred while the case was before the Commission. Further, plaintiff has not been surprised or prejudiced by defendant's

---

**42.** Act of Mar. 3, 1875, ch. 152, 18 Stat. 482, 43 U.S.C. §§ 934–39 (1976) [hereinafter the 1875 Right-of-Way Act]. The 1875 Right-of-Way Act was repealed by the Federal Land Policy and Management Act of 1976 (Pub.L.No. 94–579, § 706(a), 90 Stat. 2793) effective on and after Oct. 21, 1976, as to issuance of rights-of-way through public lands and lands of the National Forest System.

**43.** Defendant excuses its Mar. 15, 1976, response as meaning that no Southern Pacific

Railroad right-of-way came into existence after plaintiff's reservation was established on May 28, 1912, and not to mean that a valid right-of-way does not now exist.

**44.** Plaintiff cites Rule 71(g)(2) (duty to correct information obtained in discovery); Rule 76(b) and (c) (imposition of sanctions for evasive or incomplete answers); and Rule 114(b) (noncompliance with pretrial orders).

submission with its posttrial brief of copies of original Department of the Interior records. At the trial, plaintiff had notice that one of defendant's defenses was that, when plaintiff's reservation was created in 1912, it was then subject to Southern Pacific's preexisting right-of-way. The two plats that show the "Status of Public Domain Lands and Mineral Titles" were introduced at the May 16, 1977, trial. The maps that show the approval by the Secretary of the Interior, which defendant attached to its brief, corroborate information on plats already in evidence. Both the plats and the profiles would qualify as adjudicative facts entitled to judicial notice under section 201(b)(2) of the Federal Rules of Evidence. A judicially noticed fact is one "not subject to reasonable dispute" when it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Official records of the Department of the Interior, stored in the National Archives, concerning rights-of-way acquired by railroads on lands in the public domain so qualify.[45]

■ Congress in 1875 enacted a procedure by which a railroad company duly organized under the laws of any state or territory, could secure a right-of-way, after compliance with the statutory requirements, through the public lands of the United States, without going through the cumbersome enactment of a private bill. The procedure provided a right-of-way of 100 feet on each side of the central line of the road, with the right to take from adjacent public lands, material, earth, stone and timber necessary for the construction of the railroad, with not to exceed 20 acres of ground in each 10 miles of road for station buildings, depots, machine shops, water stations, or other facilities. Any railroad, to secure a right-of-way, was required to file with the Secretary of the Interior, a copy of its articles of incorporation and proof of its organization. Thereafter, the railroad was required to file a profile of its road which, upon approval of the Secretary, was noted on the plats maintained in the land office for the district. Land so noted thereafter would be subject to the right-of-way. If any section of the railroad was not completed in 5 years, the Act provided the rights would be forfeited as to any such uncompleted section.[46] The 1875 Right-of-Way Act enabled a railroad company to secure a grant of a right-of-way over the public domain (1) by actual construction of the road or (2) in advance of construction, by filing a map as provided in the Act and by completing actual construction within 5 years of the filing.[47]

The Southern Pacific Railroad of Arizona filed and the Secretary of the Interior approved on December 19, 1879, and June 3, 1880, profiles of the right-of-way on plaintiff's reservation. The December 19, 1879, approval was stated to be subject to "any existing rights of the Texas and Pacific Railway Company." There was no limitation on the June 3, 1880, approval.

---

**45.** *Cf. Great N. Ry. v. Steinke*, 261 U.S. 119, 126, 43 S.Ct. 316, 319, 67 L.Ed. 564 (1923) (files of General Land Office not within range of judicial notice when copies not produced in evidence at trial).

**46.** Section 4 of the 1875 Right-of-Way Act, *supra* note 42, provides:

"Any railroad company desiring to secure the benefits of this act, shall, within twelve months after the location of any section of twenty miles of its road, if the same be upon surveyed lands, and, if upon unsurveyed lands, within twelve months after the survey thereof by the United States, file with the officer, as the Secretary of the Interior may designate, of the land office for the district where such land is located a profile of its road; and upon approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office; and thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way: *Provided*, That if any section of said road shall not be completed within five years after the location of said section, the rights herein granted shall be forfeited as to any such uncompleted section of said road."

**47.** *Stalker v. Oregon Short Line R.R.*, 225 U.S. 142, 146, 32 S.Ct. 636, 637, 56 L.Ed. 1027 (1912); *Jamestown & N. R.R. v. Jones*, 177 U.S. 125, 131, 20 S.Ct. 568, 570, 44 L.Ed. 698 (1900); *see also Great N. Ry. v. United States*, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1942); *Great N. Ry. v. Steinke, supra* note 45, 261 U.S. at 119, 43 S.Ct. at 316; *Kindred v. Union Pac. R.R.*, 225 U.S. 582, 32 S.Ct. 780, 56 L.Ed. 1216 (1912).

No affirmative evidence in the record establishes that the Southern Pacific Railroad had complied with the provisions of the Act that require a filing of articles of incorporation and proof of organization. Further, there is no direct evidence in the record of when the Southern Pacific Railroad actually completed the sections of road depicted on the profiles that were filed. In the absence of evidence to the contrary, however, the Secretary's approval of the filings may be presumed to have been after compliance with statutory requirements, and the road to have been completed within the statutory period. This conclusion is supported by general information in the record that indicates the Southern Pacific Railroad was chartered in Arizona in 1878, reached the Gila Bend on March 31, 1879, and was at Maricopa Station, 35 miles south of Phoenix on April 28, 1879, and on March 20, 1880, had reached Tucson.[48] The Supreme Court, in an unrelated case, has noted that by 1881 the Southern Pacific Railroad had built a line from California across Arizona and New Mexico and connected to the Texas and Pacific Railroad at Sierra Blanco, Texas.[49]

Notwithstanding the deficiencies in defendant's offer of proof, there is sufficient evidence in the record to establish a prima facie case that the Southern Pacific Railroad had completed construction of its line over land that became plaintiff's reservation within the period required by the 1875 Right-of-Way Act.

Plaintiff challenges defendant's prima facie showing that the Southern Pacific Railroad had complied with the requirements of the 1875 Right-of-Way Act by a collateral attack on the railroad's right to take advan-

tage of the Act. Plaintiff's principal contention is that the land on which the Southern Pacific built its line already had been withdrawn from the public domain, and the provisions of section 5 of the 1875 Right-of-Way Act precluded approval by the Secretary of the Interior.[50] To support this contention, plaintiff traces the turbulent history of the Texas and Pacific Railroad,[51] in the era of transcontinental railroad building in the latter half of the 1800's. Plaintiff relies principally on *Southern Pac. Ry. v. Esquibel.*[52] Plaintiff misreads *Esquibel.* The New Mexico court was concerned with what occurred in New Mexico, not in Arizona, and says nothing about where or when Southern Pacific tracks crossed Arizona. In *Esquibel,* the court was concerned with right to land which originally had been reserved to the Texas and Pacific Railroad in a special land grant act. The case is not authority for permitting a third party attack of the rights of a railroad under the 1875 Right-of-Way Act. Plaintiff cites subsequent legislative history and congressional debates that reflect the competition and controversy generated in this period and which ultimately resulted in 1885 in forfeiture of all lands previously granted the Texas and Pacific Railroad and their restoration to the public domain.[53]

■■■■ Plaintiff's challenge to the Secretary's approval of the Southern Pacific's right-of-way is precluded by numerous decisions of the Supreme Court. Once the Secretary of the Interior has given his approval to the filings required by the 1875 Right-of-Way Act, the right of a railroad to invoke the benefits of the Act is not subject to attack by a third party, other than the

---

**48.** 2 E. Peplow, *History of Arizona* 363–64 (Lewis Historical Publishing Co., New York); N. Wilson & F. Taylor, *Southern Pacific, The Roaring Story of a Fighting Railroad* 239 (McGraw-Hill Book Co., New York).

**49.** *United States v. Southern Pac. Co.*, 259 U.S. 214, 227–28, 42 S.Ct. 496, 497–98, 66 L.Ed. 907 (1922).

**50.** Section 5 of the 1875 Right-of-Way Act, *supra* note 42, provides:

"That this act shall not apply to any lands within the limits of any military, park, or Indian reservation, or other lands especially reserved from sale, unless such right of way shall be provided for by treaty-stipulation or by Act of Congress heretofore passed."

**51.** Incorporated by Congress by the Act of Mar. 3, 1871, ch. 122, 16 Stat. 573.

**52.** 5 N.M. 123, 20 P. 109 (1889).

**53.** Act of Feb. 28, 1885, ch. 265, 23 Stat. 337.

United States, nor may such third party assert that the railroad has failed to comply with the terms of the Act.[54] The United States, of course, may attack a railroad's right to take, and the extent of its rights, under the acts of Congress.[55] A third party may show that at the time the Secretary gave his approval the lands were not part of the public domain and that the approval was beyond his jurisdiction. Such collateral attack, however, only may be asserted by a party able to show that it would be entitled to the interest it seeks to defeat.[56] Plaintiff does not have such an interest in the Southern Pacific right-of-way that would permit a collateral attack.

Plaintiff seeks to defeat the Secretary's approval of the Southern Pacific's filing under the 1875 Act on the ground that the land had already been acquired by the Texas and Pacific Railroad and as land "specially reserved from sale" had been removed from the public domain. Whatever the merits of plaintiff's construction of section 5 of the 1875 Right-of-Way Act,[57] the forfeiture of the Texas and Pacific lands ordered by Congress in 1885 provided that the lands were restored to the public domain. At that time, the Southern Pacific had constructed and was operating its railroad over the right-of-way in controversy. When the lands were restored to the public domain,

Southern Pacific had satisfied the requirements of the 1875 Right-of-Way Act. It would do violence to the purpose of the Act to say that Southern Pacific was not permitted to build there, or, having built, not permitted to stay there.[58] As of the date the Texas and Pacific lands were restored to the public domain, Southern Pacific had a valid right-of-way, if not before.[59]

*General Accounting*

The sixth cause of action in plaintiff's petition filed August 8, 1951, sought a full and complete accounting of all income and disbursements made by defendant for plaintiff and for all of plaintiff's funds, assets and properties administered by defendant. Defendant's accounting for plaintiff's money and property is wholly inadequate under the standards that have been established by the Indian Claims Commission and by this court. Defendant's accounting does not account for tribal funds held outside the Treasury by defendant's representatives, nor does it account for defendant's administration of tribal properties. Further, the information that defendant did produce is incomplete, inconsistent, and insufficient to enable the Indians to ascertain whether defendant's obligations as a fiduciary have been faithfully discharged.

54. *Noble v. Union River Logging R.R.*, 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123 (1893); *Washington & Idaho R.R. v. Coeur D'Alene Ry. & Nav. Co.*, 160 U.S. 77, 16 S.Ct. 231, 40 L.Ed. 355 (1895); *Van Dyke v. Arizona E. R.R.*, 248 U.S. 49, 39 S.Ct. 29, 63 L.Ed. 119 (1918); *Northern Pac. R.R. v. Smith*, 171 U.S. 260, 18 S.Ct. 794, 43 L.Ed. 157 (1898) (Special Act); *Van Wyck v. Knevals*, 106 U.S. 360, 1 S.Ct. 336, 27 L.Ed. 201 (1882) (Special Land Grant/Right-of-Way Act).

55. *Great N. Ry. v. United States, supra* note 47, 315 U.S. at 276–77, 62 S.Ct. at 535; *United States v. Denver & R.G. Ry.*, 150 U.S. 1, 14 S.Ct. 11, 37 L.Ed. 975 (1893); *United States v. Southern Pac. R.R.*, 146 U.S. 570, 13 S.Ct. 152, 36 L.Ed. 1091 (1892).

56. *Great N. Ry. v. Steinke, supra* note 45, 261 U.S. at 119, 43 S.Ct. at 316; *Oregon Trunk Line Inc. v. Deschutes R.R.*, 172 F. 738 (D.Or.1909); *Duluth & Iron Range R.R. v. Roy*, 173 U.S. 587, 19 S.Ct. 549, 43 L.Ed. 820 (1899); *Hastings & Dakota R.R. v. Whitney*, 132 U.S. 357, 10 S.Ct. 112, 33 L.Ed. 363 (1889); *Railway Co. v. Alling*,

99 U.S. 463, 25 L.Ed. 438 (1879) (Construction of Sec. 2 of the 1875 Right-of-Way Act).

57. Plaintiff cites no decisions or other authority for the proposition that the phrase "specially reserved from sale" in section 5 had application to a filing made by Texas and Pacific under its organization act. Plaintiff's construction is inconsistent with section 3 of the 1875 Act. It flies in the face of the clear congressional purpose to facilitate construction of the railroads by authorizing and providing a procedure by which private property and possessory claims on the public lands of the United States can be condemned for railroad purposes. (*Washington & Idaho R.R. v. Osborn*, 160 U.S. 103, 16 S.Ct. 219, 40 L.Ed. 346 (1895)).

58. *United States v. Denver & R. G. R.R., supra* note 55, 150 U.S. at 9, 14 S.Ct. at 13.

59. *United States v. Southern Pac. Transp. Co.*, 543 F.2d 676, 697 (9th Cir. 1976).

The April 16, 1971, GSA report, provides an accounting only for money received by defendant and deposited in the Treasury in the tribal Indian Money Proceeds of Labor (IMPL) account, and for interest earned on that account. Defendant asserts that it had no duty to make the supplemental accounting pursuant to the January 14, 1976, order relative to deposits in an Individual Indian Moneys (IIM) account. This assertion is continued in defendant's posttrial briefing notwithstanding the fact that the form and content for reports on Indian accounts utilized in the 1971 GSA report had been criticized and rejected by the court and the Commission many years previously.[60] The inadequacy of GSA reports in the "old-style" was recognized by the presiding commissioner at the May 16, 1977, trial.[61]

The parties have pursued the procedure promulgated by the Commission for preparation of a general accounting claim.[62] This procedure shifts the burden of going forward to plaintiff without regard to the inadequacy of the initial GSA report. Where, however, plaintiff has sufficient information about an item to challenge it, the defendant (when ordered) comes forward with additional information in order to discharge its obligation as to the item's propriety. Through the Commission's procedures

on accounting claims, defendant has secured dismissal of most of plaintiff's exceptions, and now would limit the accounting issues to plaintiff's exceptions Nos. 1, 2 and 7.

The adequacy of defendant's general accounting, however, remains an issue in this case. Plaintiff filed numerous motions and interrogatories to secure information concerning the status of its accounts and defendant's management of its property, and for an accounting that defendant would be required to make under fiduciary accounting principles. Defendant's responses, however, have been evasive and manifest an intent to "stonewall" plaintiff.

■ The standards that apply to defendant's accounting obligations are clear. Where the Government takes on or has control and supervision over tribal money or property, the normal relationship is fiduciary unless Congress expressly has provided otherwise.[63] Defendant must account for all Indian money that is in its hands, both that classified as Indian Money Proceeds of Labor and deposited in the United States Treasury and that called Individual Indian Moneys and held outside the Treasury. IIM funds are recognized as trust funds.[64] In 1976, the Commission stated:[65]

in pursuance of the petition along with such appropriate motion as defendant may see fit under the circumstances. Petitioner will then file in writing within ninety (90) days its specific exceptions, if any, along with its reasons therefor, to any item or items which it contends are in violation of a proper accounting and which should be disallowed. Defendant will file an answer within the usual time. The parties will then be at issue and may proceed to a hearing on the matter."

**60.** *Blackfeet & Gros Ventre Tribes of Indians v. United States*, 32 Ind.Cl.Comm. 65, 143–48 (1973); *see also Navajo Tribe of Indians v. United States, supra* note 20.

**61.** Commissioner Yarborough stated:
"Let me simplify this. The Commission now knows, as undoubted fact, that the so-called old-style reports were limited to money filed with the Treasury. They did not account for what seems to be, on many reservations, the major part of the funds, which were wheeled around in I.I.M. accounts. So, I think any further pursuit of that line doesn't educate the Commission any more than it knows. It knows that the old reports were completely inadequate, and has many times ruled. So, let's go on from there."

**62.** *Sioux Tribe of Indians of the Cheyenne River Reservation v. United States*, 12 Ind.Cl. Comm. 541, 547 (1963). The procedure prescribed was:
"It is the opinion of this Commission that the desirable procedure to be followed in these accounting cases consists of the filing of the General Accounting Office report by defendant

**63.** *See Navajo Tribe of Indians v. United States, supra* note 20, 224 Ct.Cl. at ——, 624 F.2d at 990–91; *Cheyenne-Arapaho Tribes v. United States, supra* note 23; *Menominee Tribe of Indians v. United States*, 102 Ct.Cl. 555, 59 F.Supp. 137 (1945).

**64.** *Gila River Pima-Maricopa Indian Community v. United States*, 38 Ind.Cl.Comm. 1, 21–23 (1976).

**65.** *Fort Belknap Indian Community v. United States*, 39 Ind.Cl.Comm. 108, 116 (1976).

We believe that our decisions establish that the Government is obliged to account for all tribal funds held outside the treasury by its officers and agents, regardless of whether they are called "Individual Indian Moneys," or by some other and perhaps more accurate name. The defendant, better than anyone else, can determine what these funds were for.

■ If complete control of tribal organization funds in fact has been transferred to the tribe, the Government is not required to account. If the Government contends that control has been transferred, it has the burden of showing that fact, and, where tribal leadership did not control use of the money, the Government must account.[66]

■ Indian moneys held in IMPL accounts earn interest and such earnings must be accounted for.[67] No statute requires interest to be paid on IIM accounts or on tribal bank accounts, but when IIM accounts that contain tribal money are deposited where they earn interest, either in the Treasury or in commercial banks, such interest earnings must be accounted for.[68]

■ The Government has no obligation to administer Indian assets (other than money) for profit, but if it has undertaken so to do, it must account. Where the Government has used reservation land itself, or permitted third parties such use, or has permitted trust assets to be exploited for nontrust purposes, accounting is required.[69]

The form and detail appropriate to an accounting by a fiduciary is well established. The Commission defined the format needed to demonstrate faithful discharge of defendant's obligations to the Indians for management of trust properties:[70]

(a) Separate schedules should be prepared for each category of use, i.e., non-mineral leases, oil and gas leases, other mineral or material leases and permits, rights-of-way, timber matters, buildings constructed with tribal funds, other miscellaneous transactions.

(b) Each schedule should list in chronological order the leases, rights-of-way, or other arrangements covered. The identification number of the contract, if any, should be shown, as well as the date, the lessee, grantee, etc., a description of the land involved, the stipulated consideration (bonus, rental, royalty, fee per AUM, etc.) with the dates, and, if defendant does not supply a copy, a reference to where the original of the contract is available for plaintiff's inspection and copying.

(c) Sufficient data should be given to enable the plaintiff and the Commission to determine whether the defendant performed its duty of enforcing the contract terms.

(d) For each listed contract or arrangement the defendant should provide an account showing the dates and amounts for all payments it collected thereunder and the fund to which they were credited. If the collections were handled by tribal personnel not under Government supervision, the defendant's account should so state.

(e) As to movable property purchased by the Government with tribal trust funds, except perhaps as to particular items of great value and long useful life, an acceptable account need consist of no more than the year of acquisition, the

---

**66.** *Navajo Tribe of Indians v. United States*, 34 Ind.Cl.Comm. 432, 434 (1974); *Navajo Tribe of Indians v. United States*, 39 Ind.Cl.Comm. 10, 14 (1976).

**67.** *See* 25 U.S.C. § 161b (1946).

**68.** *United States v. Gila River Pima-Maricopa Indian Community*, 218 Ct.Cl. 74, 85, 586 F.2d 209, 216 (1978); *see also Gila River Pima-Maricopa Indian Community v. United States, supra* note 64, 38 Ind.Cl.Comm. at 21–22.

**69.** *Blackfeet & Gros Ventre Tribes of Indians v. United States, supra* note 60, 32 Ind.Cl.Comm. at 78; *Navajo Tribe of Indians v. United States, supra* note 20, 224 Ct.Cl. at ——, 624 F.2d at 986–88.

**70.** *Blackfeet & Gros Ventre Tribes of Indians v. United States, supra* note 60, 32 Ind.Cl.Comm. at 82.

cost, and the use to which the property was put, stated with enough detail to distinguish whether that use was governmental, tribal, or individual.

The Commission's ruling for an accounting of IIM accounts required defendant to file information that: [71]

a. Identifies all IIM accounts opened in the name of the plaintiffs, or of any one of them, or in the name of any tribal organization, association, or corporation of plaintiffs or of any one or combination of them, together with the opening and closing date of each such account.

b. Identifies the beginning balance of each account and all deposits by amount, date, and source if known.

c. Identifies all withdrawals from each such account by amount, date, payee, and purpose if known.

d. Identifies all interest or other income generated by funds, the ownership of which was in any plaintiff, tribal organization, association, or corporation at the time of deposit, and which was held in Special Deposits or other suspense account or tribal IIM account at the plaintiff's respective reservations or elsewhere outside the treasury of the United States.

The accounting shall extend from the earliest date any such fund existed until August 13, 1946.

█ Defendant has not made an accounting that is required by its obligations as a fiduciary with respect to either plaintiff's money it handled, or the property it managed. Rentals from the Decker lease were deposited in an IIM account, No. M–261. The GSA March 15, 1976, letter indicates that collections subsequent to 1948 probably were deposited in the same IIM account. The agent for the Ak Chin reservation had no authority at all to place the Decker rental payments due in 1946, 1947, and the first semiannual payment for 1948, in an IIM account.[72] Rentals from the Fuqua lease and the L. C. Barnes leases in 1947 and 1948, however, were deposited to the tribal IMPL account in the Treasury.

Defendant has made no accounting of IIM account No. M–261, nor has defendant accounted for any other IIM account it may have established for plaintiff. With respect to the IMPL fund, defendant has not shown: (a) when the fund was opened, and its beginning balance; and (b) annual disbursement schedules that show the date, payee, amount, and purpose of the expenditures.

Given the virtually complete failure of defendant to discharge its accounting responsibilities, how to proceed with this ancient case at this stage of its existence presents a problem. This case was filed August 8, 1951, and is concerned only with claims that arose before August 13, 1946. All of plaintiff's substantive claims described in causes of action one through five in the petition have been dismissed, five of plaintiff's ten exceptions have been dismissed, and two have been abandoned. The case, of course, could be continued until defendant has made the type of accounting that it should have made. Such a course would result in the expenditure of still more time and resources, but probably with little benefit.

Defendant's failure to render a proper accounting is not due solely to intransigence. There has been a failure to keep adequate records and the record-keeping deficiencies have been compounded by insufficient manpower available to work on this and other claims brought by other Indian tribes. If needed records do not now exist, they will not be found in further rooting through the archives. Notwithstanding defendant's reluctance to account,

71. *Fort Belknap Indian Community v. United States,* supra note 65, 39 Ind.Cl.Comm. at 120–21.

72. Effective Feb. 25, 1948, new regulations relative to agricultural leases of reservation land permitted payment of rentals directly to a lessor tribe authorized to receive the proceeds or payment to the superintendent for deposit in the IIM account of the tribe. 25 C.F.R. § 171.-10 (1949). Prior to that date no regulation permitted such deposits and the statute required lease payments to be deposited in IMPL accounts. 25 U.S.C. § 155 (1976).

it has provided partial information on those subjects ordered by the Commission.

The size of plaintiff's population and its reservation caused it to be an administrative appendage in the Pima Indian Agency. Separation of, and allocations for, the Ak Chin accounts for the period 1912 through 1946 so as to produce an accounting that meets formal requirements would be difficult as well as expensive. Whether it would be an adequate basis for further relief is problematic.

Plaintiff's accounting exceptions have raised two principal subjects: agricultural leases on the reservation and rights-of-way across the reservation. Of the nine agricultural leases cited by plaintiff, only one involves a claim that arose before August 13, 1946. The one right-of-way claim that came within the Commission's jurisdiction has been found to be without merit. Notwithstanding plaintiff's protests about a lack of information because of the deficiencies in defendant's accounting, it is unlikely that other categories of factual situations exist that would serve as a base for further claims in the 1912–46 period. Plaintiff lived on the reservation that defendant administered, and has had since 1951 to locate and develop its claims.

Further accounting in this case is not likely to result in a substantial change in posture. In these circumstances, the better course is to compensate plaintiff for the pre–1946 claims it established, require defendant to suffer the consequences of its inadequate record-keeping and incomplete accounting, and close the record on all of plaintiff's claims that arose before August 13, 1946.

Plaintiff is entitled to recover $135,902.71 in connection with the Decker lease, appropriate interest on the $19,472.81 rentals paid on the Decker lease, deposited in account No. M–261, and disbursements on schedule No. 4 (pages 25 and 26 of the 1971 GSA report) in the amount of $5,827.97.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court,

the court concludes as a matter of law that plaintiff, the American Indians residing on the Maricopa-Ak Chin reservation, is entitled to recover in accordance with this opinion and judgment is entered to that effect.